**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-1381**

---

ODALIS MIREIDA CHICAS-MACHADO,

      Petitioner,

  v.

MERRICK B. GARLAND, Attorney General,

      Respondent.

---

On Petition for Review of an Order of the Board of Immigration Appeals.

---

Argued:  September 16, 2022                    Decided:  July 13, 2023

---

Before AGEE and HARRIS, Circuit Judges, and MOTZ, Senior Circuit Judge.

---

Petition for review granted in part, denied in part, and remanded by published opinion. Senior Judge Motz wrote the opinion, in which Judge Harris joined.  Judge Agee wrote an opinion concurring in part and dissenting in part.

---

**ARGUED:**  Daniel Warren Thomann, DANIEL THOMANN, P.C., Chicago, Illinois, for Petitioner.  Kevin Conway, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Brian Boynton, Acting Assistant Attorney General, Justin Markel, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

DIANA GRIBBON MOTZ, Senior Circuit Judge:

An Immigration Judge (IJ) denied Odalis Mireida Chicas-Machado asylum, withholding of removal, and protection under the Convention Against Torture (CAT). The Board of Immigration Appeals (BIA) affirmed, and Chicas-Machado now petitions for review. We grant the petition for review in part, deny it in part, and remand the case to the BIA for further proceedings consistent with this opinion.

I.

Chicas-Machado, a native and citizen of El Salvador, started attending an evangelical church, the Pentecostal Church, in 2014. She became a member in 2015, and eventually acted as the church's secretary.

Late in 2015, members of the MS-13 gang began to harass and insult Chicas-Machado several times a week when she left her home to walk to and from church. Chicas-Machado testified that the MS-13 members considered her "their enemy because I used to spread the Word of God and because I wanted [to] tell the young people to attend church." When asked if the gang members cared about her religion when harassing her, she stated, "They didn't care, no." She explained, "[T]hey didn't care that I was Christian . . . they could do with me whatever they pleased to do with me . . . ."

Approximately a year after this harassment began, MS-13 gang members escalated their conduct and threatened Chicas-Machado with death. On December 4, 2016, they confronted Chicas-Machado at one of her neighbors' stores near her home. There they ordered her to "collaborate with them . . . [to] tell them every time that a police car went there . . . [since] because [she] was Christian . . . no one will suspect . . . [her]." Instead of

2

doing as the gang members ordered, Chicas-Machado reported their threat to the police. The police officers promised that they would try to detain the gang members.

Two days later, on December 6, 2016, MS-13 members again threatened her — this time they went to her own home. They told her that they had learned that she had filed a police report and threatened to rape and kill her. Chicas-Machado knew at the time that MS-13 had disfigured and then murdered her uncle when he refused to join them. She also knew that MS-13 had threatened a member of her church "the same way" they had threatened her and killed him days later. Accordingly, in response to the threats, she left El Salvador on December 16, 2016 (arriving in the United States on December 24, 2016).

Chicas-Machado filed for asylum and withholding of removal, contending that MS-13 gang members targeted her because of her membership in, attendance at, and service for the Pentecostal Church. In support of her application, she submitted evidence aiming to establish both that MS-13 persecuted her personally and that the gang systematically persecuted Evangelical Christians. She also based her claim for asylum and withholding of removal on fear of persecution as a member of two proposed social groups: (1) Salvadorans who refuse to comply with gang orders for moral and religious reasons, and (2) Salvadorans who file police reports against gangs. Additionally, she applied for protection under the CAT and submitted evidence of massive human rights violations in El Salvador, as well as other relevant country conditions evidence.

An IJ denied Chicas-Machado's application. The IJ found Chicas-Machado credible but concluded that she failed to establish her eligibility for asylum, withholding of removal, or CAT protection. The IJ determined that Chicas-Machado's persecution did

3

not have a nexus to her religion. In addition, the IJ concluded that her two proposed social groups were not socially distinct and cognizable, and that she was not entitled to CAT protection because she presented no evidence that she had been subjected to torture in which the government of El Salvador acquiesced, or that she would be subjected to such treatment upon return to El Salvador.

On March 12, 2021, the BIA, without adopting the IJ's opinion, issued an opinion agreeing with the IJ on every issue. The BIA did not disturb the IJ's credibility finding but nonetheless found that Chicas-Machado's claimed persecution was not on account of her religion. The BIA also agreed with the IJ's conclusions finding Chicas-Machado ineligible for CAT protection and determining that her two proposed social groups were not cognizable. Chicas-Machado now seeks review of that decision.

Because the BIA issued its own opinion without adopting that of the IJ, we review only the BIA's opinion. *See Martinez v. Holder*, 740 F.3d 902, 908 (4th Cir. 2014). We consider the BIA's legal conclusions de novo, and determine whether substantial evidence supports its factual findings. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015). The BIA errs "when it . . . distorts or disregards important aspects of the alien's claims." *Jian Tao Lin v. Holder*, 611 F.3d 228, 235, 237 (4th Cir. 2010) (citation omitted) (holding that the BIA erred when basing a credibility determination on "unrelated facts" in a manner "manifestly contrary to law").

4

II.

A.

Chicas-Machado contends that the BIA erred in failing to find a nexus between her religion and the persecution she experienced. To be eligible for asylum, Chicas-Machado must show that she is a "refugee" as defined by the Immigration and Nationality Act (INA). *Sorto-Guzman v. Garland*, 42 F.4th 443, 448 (4th Cir. 2022). A refugee seeking asylum must prove she "(1) has a well-founded fear of persecution; (2) on account of a protected ground [*e.g.*, race, religion, nationality, membership in a particular social group, or political opinion]; (3) by an organization that the Salvadoran government is unable or unwilling to control."[1] *Hernandez-Avalos*, 784 F.3d at 949.

To establish a well-founded fear of persecution, an asylum applicant "may show that [s]he was subjected to past persecution, in which case [s]he is entitled to a rebuttable presumption that [s]he has a well-founded fear of future persecution." *Tairou v. Whitaker*, 909 F.3d 702, 707 (4th Cir. 2018). We have long and repeatedly held that a death threat qualifies as persecution. *See Sorto-Guzman*, 42 F.4th at 449; *Hernandez-Avalos*, 784 F.3d at 949; *Crespin-Valladares v. Holder*, 632 F.3d 117, 126 (4th Cir. 2011); *Qiao Hua Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005). Chicas-Machado received at least one death threat. She has thus established that she experienced persecution.

We turn to the question of whether this persecution of Chicas-Machado was "on account of" her religion. To establish this an asylum applicant need not demonstrate that

---

[1] That the Salvadoran government is unable or unwilling to control MS-13 gang members is not disputed in this appeal.

5

a protected ground, like religion, is the sole reason for persecution but only that it is "at least one central reason" for the persecution. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i). But the protected ground "cannot be [simply] incidental, tangential, superficial, or subordinate to another reason for harm." *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009) (citing *In re J-B-N-*, 24 I. & N. Dec. 208, 214 (BIA 2007)). Whether an asylum applicant has established nexus is a question of fact, which we review to determine whether substantial evidence supports the BIA's conclusion. *See Cortez-Mendez v. Whitaker*, 912 F.3d 205, 209 (4th Cir. 2019).

The BIA found that MS-13 gang members "told [Chicas-Machado] they wanted her assistance because no one would suspect she would be working with the gang based on her activity and conduct with the church." From this fact the BIA decided that gang members "saw her as an asset they could exploit to further their criminal enterprise." The BIA then concluded that religion was not a motive for MS-13's persecution of Chicas-Machado.

In reaching this conclusion on nexus, the BIA ignored the well-established principle, set forth above, that proof of persecution on account of a protected ground need not be the sole reason for persecution to qualify an applicant for asylum. *See Quinteroz-Mendoza*, 556 F.3d at 164. Review of the record demonstrates that Chicas-Machado established that *one* central reason MS-13 chose to target her was her religion. Even the motive for the gang's persecution that the BIA recognized — her use as a potential asset to the gang because "no one would suspect [her]" given "her activity and conduct with the church" — was inextricably intertwined with her religion. *See Cruz v. Sessions*, 853 F.3d

6

122, 129 (4th Cir. 2017) (holding that the BIA errs when it fails to consider *intertwined* reasons for persecution); *Oliva v. Lynch*, 807 F.3d 53, 60 (4th Cir. 2015) (same).

Our precedent repeatedly rejecting "excessively narrow reading[s]" of the requirement that persecution be on account of a protected status controls the outcome in this case.[2]  *See Hernandez-Avalos*, 784 F.3d at 949.  For example, in *Salgado-Sosa v. Sessions*, a claimant argued that gangs threatened him because of family ties to his stepfather.  882 F.3d 451, 457 (4th Cir. 2018).  We held that the BIA erred in rejecting his claim by focusing on whether his *family* was persecuted on account of a protected ground, rather than whether *he* was persecuted on a protected ground, *i.e.*, his relationship to his family.  *Id.*  We concluded that the claimant's family ties were at least one central reason for his feared persecution.  *Id.*  This was so because the record established that the threats he received were on account of his stepfather's conflict with a gang, not his own.  *Id.*

---

[2] We have never before considered a case where a gang targeted a person for assistance or forced labor because of her religion and then threatened her for refusing to aid them.  Such cases are rare, but in the only two cases (both unpublished) that we have located in which our sister circuits have addressed similar factual situations, they have recognized the potential nexus in such circumstances between the persecution of an applicant and her religion.  *See Azurdia-Hernandez v. U.S. Att'y Gen.*, 812 F. App'x 935, 937–39 (11th Cir. 2020) (finding that the BIA erred in failing to give reasoned consideration to a religion-based persecution claim when a cartel asked petitioner to launder money because "they trusted her because of her religion," and threatened her when she refused); *Kasama v. Gonzales*, 219 F. App'x 28, 31 (2d Cir. 2007) (finding nexus where petitioner was persecuted after refusing conscription because of his religious beliefs).  Moreover, the Eleventh Circuit explained that "we cannot rule out -- as a matter of law -- that an asylum applicant might demonstrate religion-based persecution based on evidence that he was targeted for forced labor or some other oppressive treatment because the persecutor perceived some positive attribute . . . associated with the persecuted person's religion that would serve the persecutor's goals." *Azurdia-Hernandez*, 812 F. App'x at 939.

at 457–58.  In addition, the factual findings adopted by the BIA showed that the claimant's demonstrated harm was on account of his family ties, and we held that the BIA thus contradicted itself in finding no nexus.  *Id.* at 458.

The same rationale that compelled a finding of nexus in *Salgado-Sosa* applies here. Just as Salgado-Sosa offered evidence that clearly established that he was persecuted *on account of* his stepfather's conflict with a gang, and thus on account of his relationship with his stepfather, here, Chicas-Machado offered evidence that clearly established that she was persecuted *on account of* her membership in, service for, and ties to the church. Moreover, the BIA's finding of lack of nexus here, like that in *Salgado-Sosa*, contradicted its own factual findings.  For the BIA itself found that the gang members targeted Chicas-Machado for assistance "because no one would suspect she would be working with the gang *based on her activity and conduct with the church*."  (emphasis added).

In *Hernandez-Avalos v. Lynch* we also rejected a narrow interpretation of the nexus requirement.  There, we reversed the BIA's finding that there was no nexus to a protected ground when a gang threatened the petitioner for trying to prevent her son from joining the gang.  We concluded that the petitioner had established such a nexus because her familial relationship to her son "is why she, and not another person, was threatened with death." *Hernandez-Avalos*, 784 F.3d at 950.  The BIA had reasoned that the gang's threats were "directed at her not because she is his mother but because she exercises control over her son's activities."  *Id.*   In reversing the BIA's decision, we explained that this was "a meaningless distinction under these facts."  *Id.*  The BIA relied on a similarly meaningless distinction when reviewing Chicas-Machado's case.  Here, the gang's threats of death were

8

directed at Chicas-Machado, and not another person, because she was a practicing Christian and an active member of an evangelical church, which made her useful to the gang.[3]

Nevertheless, the dissent insists that MS-13 members "threatened Chicas-Machado for two reasons only:  (1) she refused to serve as a police spotter, and (2) she reported the gang's recruitment effort to the police."  Six years ago, in *Cruz v. Sessions*, we expressly rejected this precise theory:  we held that retaliation for reporting — or threatening to report — activity to the police did not negate what would otherwise be nexus to a protected ground.  853 F.3d at 129.  In *Cruz*, we reversed the BIA and explained that it erred in not recognizing persecution "on account of" a protected ground (Cruz's relationship with her husband) even though the persecutor, much like the persecutors here, *escalated* his conduct to persecution only *after* the applicant threatened to involve the police.

_____

[3] The dissent criticizes our reliance on *Salgado-Sosa* and *Hernandez-Avalos* because they involved persecution based on family ties, rather than religion, and because Chicas-Machado did not specifically rely on those cases in making her arguments.  With respect to the dissent's first criticism, nothing in the text of the INA or our case law suggests that the phrase "on account of" means one thing in family ties cases and another in religious persecution cases.  It is therefore irrelevant that *Salgado-Sosa* and *Hernandez-Avalos* involved nexus based on family ties; the question at issue — whether the applicant's feared persecution is "on account of" a protected ground — is the same. With respect to the dissent's second criticism, the cases relied on by the parties are, of course, not the only authority that a court can or should consider in reaching its decision. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) (explaining that "the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law"); *cf. Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018) ("[P]arties cannot waive the application of the correct law.").  Notably, the dissent itself fully embraces the principle that a court may consult cases not cited by the parties, as it very heavily relies on *Cortez-Mendez v. Whitaker*, 912 F.3d 205, 210 (4th Cir. 2019), which also involved persecution based on family ties, and on which the Government did *not* base its arguments, or even *cite*.

In that case, Cruz's husband went missing while on a fishing trip with his employer, a drug-trafficker. *Id.* at 125. Cruz went to the boat dock to search for her husband and questioned the employer about her husband's whereabouts; he told her to stop asking questions, to which she responded that she would file a police report. *Id.* At that point, the employer threatened that Cruz would suffer the same fate as her husband, and then began threatening her family at their home. *Id.*

In her asylum application Cruz asserted that the employer persecuted her because of her familial ties to her husband, but the IJ and BIA instead held, as the dissent would here, that the sole motive for the persecution was to prevent contact with the police. *Id.* at 126. We rejected this rationale and held that "the BIA and IJ applied an improper and excessively narrow interpretation of the evidence relevant to the statutory nexus requirement." *Id.* at 129. We criticized the BIA's "shortsighted[] focus[]" on the employer's expressed concern about Cruz contacting the police, rather than the familial relationship that prompted Cruz to confront the employer and express her intent to contact the police, leading to the employer's persecution of her. *Id.* We explained that this was a

10

"misapplication of the statutory nexus standard," and that the full record compelled a conclusion that the employer's persecution of Cruz was on account of her family ties.[4] *Id.*

Erecting a barrier, as the dissent attempts to do, between the gang members' activity recruiting Chicas-Machado for assistance and their actions persecuting her would be taking the same "overly restrictive view" of the facts establishing nexus in an asylum case that we have previously warned against. *See Oliva*, 807 F.3d at 59–60 (reversing the BIA's finding of no nexus where a gang persecuted an asylum applicant for refusing to pay extortion demands that were only issued *because* of the applicant's membership in a particular social group). While a refusal to comply with a gang's demands may be "the immediate trigger for the gang's [] assault," an asylum applicant has established nexus where, as here, a protected ground is the *reason* the gang issued its demand in the first place. *Id.* at 60.

The dissent's arguments rest heavily on *Cortez-Mendez v. Whitaker*, but that case does not counsel a different outcome here. In *Cortez-Mendez*, we rejected a nexus claim because the petitioner presented no "relevant evidence," only "unsubstantiated

---

[4] The dissent seeks to distinguish *Cruz* because in that case there was "extensive evidence" of persecution over two years. But nothing in *Cruz* suggests that its holding applies only to the facts of that case. Rather, even though *Cruz* was decided only six years ago, we have often relied on *Cruz* and applied its holding to other facts. *See Perez Vasquez v. Garland*, 4 F.4th 213, 225 (4th Cir. 2021); *Alvarez Lagos v. Barr*, 927 F.3d 236, 247, 250 (4th Cir. 2019); *Aleman-Medrano v. Garland*, No. 20-1821, 2021 WL 5054688, at *4 (4th Cir. Nov. 1, 2021). Indeed, less than two years ago, in *Aleman-Medrano* (an argued but unpublished case), we recognized that *Cruz* had "rejected precisely [the] rationale" that "a desire to retaliate against [an asylum applicant] for filing a criminal complaint" negated the nexus between the subsequent persecution and "the reason why [the applicant], and not some other person, was targeted." 2021 WL 5054688, at *4. *Cruz* constitutes binding circuit precedent that persecution aimed at punishing a victim for involving the police does not negate nexus to a protected ground. That principle applies as strongly here as it did in *Cruz*.

speculation," that gangs targeted him because of his father's disabilities "as opposed to [his] rejection of gang membership." 912 F.3d at 210–11. We concluded that "[a]t most, Cortez-Mendez demonstrated that the gangs may have targeted him because of his *poverty*," which is not a protected ground. *Id.* at 210 (emphasis added). Thus, evidentiary insufficiency doomed the asylum claim in *Cortez-Mendez*. 912 F.3d at 210. There is no similar evidentiary insufficiency here. The IJ found Chicas-Machado credible, and the BIA did not disturb that finding. Indeed, the BIA credited Chicas-Machado's testimony and recognized that the gang targeted her "*because* no one would suspect she would be working with the gang *based on her activity and conduct with the church*." (emphasis added).

MS-13 members sought out Chicas-Machado and demanded that she assist them because of her position in, work for, and attendance at church; and then, because she refused to assist them, they escalated their conduct to persecution of her. As we have explained within, time and again we have held that facts such as these establish nexus between a well-founded fear of persecution and a protected ground — here, religion. *See Salgado-Sosa*, 882 F.3d at 457; *Cruz*, 853 F.3d at 129; *Oliva*, 807 F.3d at 59–60;

12

*Hernandez-Avalos*, 784 F.3d at 949–50;[5] *Alvarez Lagos v. Barr*, 927 F.3d 236, 247, 250

(4th Cir. 2019) (reversing the BIA's finding that a gang targeted an asylum applicant solely

because she failed to give them money and not on account of her membership in a certain

social group); *Temu v. Holder*, 740 F.3d 887, 891–92 (4th Cir. 2014) (vacating the BIA's

no nexus finding because "it would demand logical acrobatics" to reconcile the BIA's

narrow and contradictory nexus analysis).

### B.

The BIA's error in applying our nexus precedent in and of itself requires reversal of

its nexus finding.  However, we briefly address two additional errors — one legal and one

factual — that the BIA made in rejecting Chicas-Machado's nexus claim.

### 1.

The additional legal error is that the BIA required Chicas-Machado to prove nexus

by a higher standard than the INA requires.  The BIA concluded that because MS-13's

persecution "was not motivated to *stop or hinder* her from practicing her religion," Chicas-

Machado had not established the required nexus.  (emphasis added).  The dissent similarly

would require Chicas-Machado to prove that MS-13's intent was to *stop or hinder* her

---

[5] The dissent disagrees with the holding in *Hernandez-Avalos*, devoting an extensive discussion to criticism of that opinion.  Notwithstanding this criticism, *Hernandez-Avalos* remains binding precedent, on which our court has repeatedly relied.  *See e.g.*, *Salgado-Sosa*, 882 F.3d at 458; *Cruz*, 853 F.3d at 128–129; *Oliva*, 807 F.3d at 60; *Alvarez Lagos v. Barr*, 927 F.3d at 250 n.2; *see also Gonzalez Ruano v. Barr*, 922 F.3d 346, 353–56 (7th Cir. 2019) (relying on *Hernandez-Avalos* in reversing the BIA's determination that a man's persecution did not have nexus to the proposed social group of his wife's family).  Moreover, *Hernandez-Avalos* hardly constitutes the only precedent supporting our holding in this case.

religious practice. But nothing in the INA or our case law requires an asylum applicant to establish nexus in this manner. Rather, "[i]t is well-settled that an applicant establishes the required nexus when she demonstrates that her proposed protected status 'was or will be a central reason for [her] persecution.'" *Alvarez Lagos*, 927 F.3d at 250 (quoting *Oliva*, 807 F.3d at 59) (alteration in original). This standard does not depend on the *ultimate goal* of the persecutors or on *why* the protected ground led them to persecute an applicant. Instead, the BIA and reviewing courts consider only whether the applicant can demonstrate that the persecution was "on account of" a protected ground — here, religion. *See* 8 U.S.C. § 1101(a)(42)(A).

The dissent's attempts to justify the narrow standard used by the BIA in fact illustrate the problems with that standard. The dissent states that religious persecution is about restrictions on the right to "practice" one's religion, and argues that, for that reason, Chicas-Machado's case should not be covered by asylum protections against religious persecution. There is no dispute over the fact that Chicas-Machado's activities — spreading the word of God, acting as the church's secretary, and telling young people to attend church — constitute religious practice. So the only disputed issue is whether, in targeting Chicas-Machado because of her religious activities and then threatening to murder her, MS-13 restricted or suppressed her ability to participate in these religious activities.

The answer must be yes. As the BIA itself recognized, MS-13 gang members targeted Chicas-Machado for assistance because of her religious activities and conduct. The gang then threatened Chicas-Machado with death. Being coerced by death threats to

14

assist a gang because its members view her religiosity as an asset is plainly a "serious measure[] of discrimination imposed on [Chicas-Machado] because [she] practise[s] [her] religion." *See* Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ¶ 72 (1979, reissued 2019). Whether we label the persecution Chicas-Machado experienced as a restriction on practice of religion, suppression of religion, or disparate treatment because of religion, this persecution falls squarely within the bounds of what the United Nations Handbook and Congress would consider religious persecution.[6]

In justifying its conclusion that Chicas-Machado did not experience religious persecution, the dissent finds it dispositive that "[t]he gang never threatened to harm Chicas-Machado if she didn't renounce her faith" or "abandon her religious practices." Under the dissent's standard, a persecutor apparently must phrase a threat as an ultimatum or a verbal command to stop practicing her religion (*e.g.*, "stop practicing your religion or die") to be guilty of religious persecution. But targeting a victim for persecution because of her religion has a chilling effect, even when the threat or persecution is not delivered in the form of an ultimatum or command. And, as the dissent recognizes, this chilling effect,

---

[6] The Handbook emphasizes that "[p]ersecution for 'reasons of religion' may assume various forms." Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ¶ 72; *see also id.* ¶ 12. The Handbook also provides examples of instances when discrimination amounts to persecution, such as when it imposes restrictions on the "right to practise [one's] religion." *See id.* ¶ 54. Our holding that MS-13's death threats restricted Chicas-Machado's right to practice her religion and constitute religious persecution is completely consistent with the Handbook's guidance.

and its resulting suppression of religious practice, is exactly the harm from which Congress seeks to protect asylees and refugees.[7]

The reluctance of both the BIA and the dissent to recognize Chicas-Machado's persecution conflicts with the clear text of the INA. The policy arguments advanced by the dissent for a narrow conception of "practice of religion" and "religious persecution" do not overrule the statutory requirement set forth in the INA.

2.

The additional factual error, which may have contributed to its improper finding on nexus, is the BIA's misunderstanding of the record evidence. In its one paragraph discussion of the nexus between the persecution of Chicas-Machado and her religion, the BIA concluded that "when asked whether the gang cared that she was a Christian, she affirmed that '[t]hey didn't care, no[.]'" The BIA used this isolated statement from Chicas-Machado's testimony to bolster its conclusion that she had not demonstrated nexus between MS-13's persecution of her — threatening her with death — and her religion. But

---

[7] In response, the dissent states that it "acknowledge[s] that an applicant might demonstrate persecution on account of religion if she can show that she was singled out for some form of disparate treatment because of her religion and that such treatment reasonably chilled her religious practices." This acknowledgment requires a holding finding nexus here. The IJ expressly found Chicas-Machado credible, and she testified that MS-13 gang members singled her out for death threats in her neighbor's store and then in her home, because of her religious beliefs and ties to the church. Such persecution and death threats surely constitute disparate treatment. Moreover, this persecution so chilled Chicas-Machado's religious practice that she fled her home, leaving behind her church (a church she attended daily and for which she often proselytized), precisely because of MS-13's threats of violence. After receiving those threats and fleeing for her life, Chicas-Machado can no longer attend her church, let alone act as its secretary or proselytize and "spread the word" of God in her Salvadoran community.

16

actually, the context of this small quotation makes clear that Chicas-Machado was only repeating that the MS-13 members did not regard her religion as a reason *not* to harass, or persecute, her, *i.e.*, they did not care that she was Christian, because her religion would not prevent them from persecuting her:

> Judge: What did they say to you about your religion?
>
> Petitioner: They said that they didn't care that I was Christian, that they could do with me whatever they pleased to do with me, whatever they want, they wanted to do with me. They consider me their enemy because I used to spread the Word of God and because I wanted to tell the young people to attend church.
>
> . . .
>
> Judge: What did they say to you about your spreading the Word of God?
>
> Petitioner: That the Christian – it didn't matter that I was Christian, that they could do whatever they wanted to do with me.
>
> Judge: They didn't care that you were a Christian?
>
> Petitioner: They didn't care, no.

In the context of her entire testimony, the few words relied on by the BIA are entirely consistent with Chicas-Machado's contention that MS-13 targeted her for persecution because of her religion. The BIA must consider facts relevant to the nexus determination "holistically, with an eye to the full factual context." *Oliva*, 807 F.3d at 60. It failed to do that in this case.

It is also relevant that during this portion of her testimony, Chicas-Machado was not referring to the gang's death threats in December of 2016. Instead, she was describing the harassment she experienced walking to and from church during the preceding year. The

17

BIA erred in using Chicas-Machado's unrelated testimony about her year of harassment to negate the clear nexus between her position in the church and the gang's undisputed persecution of her in December. While the dissent contends that we are improperly considering Chicas-Machado's history of harassment by gang members to further support her religious persecution claim, we are doing exactly the opposite: correcting the BIA's improper conflation of testimony relating to these separate interactions.

### C.

In sum, the BIA erred in finding that Chicas-Machado was not a refugee under the INA due to a lack of nexus to a protected ground, religion. Chicas-Machado demonstrated past persecution on account of religion, and is therefore entitled to the presumption of a well-founded fear of future persecution. *See Qiao Hua Li*, 405 F.3d at 176-77. Recognizing the BIA's error, we grant the petition for review and remand the case for further proceedings. Upon remand, the BIA must determine whether the Government can rebut the presumption of a well-founded fear of future persecution.[8] If the BIA concludes that Chicas-Machado is eligible for asylum on remand, it should reconsider her withholding of removal claim. *See Sorto-Guzman*, 42 F.4th at 450.

We decline to reach all other issues raised on appeal as to her asylum and withholding of removal claims, and direct the BIA to reevaluate those claims following its

---

[8] Upon remand, the Government may rebut this presumption by proving that Chicas-Machado could safely relocate elsewhere in El Salvador. The IJ made factual findings related to whether Chicas-Machado could relocate safely but the BIA did not address those factual findings, let alone adopt them, so those factual findings and conclusions are not before us on appeal. Moreover, the analysis will differ significantly on remand because the *Government* will now have the burden of proving that Chicas-Machado *can* relocate.

18

reconsideration of Chicas-Machado's asylum application. *See Arita-Deras v. Wilkinson*, 990 F.3d 350, 361 n.10 (4th Cir. 2021) (declining to reach the merits of withholding of removal appeal after finding error in the BIA's asylum analysis).

III.

We turn to Chicas-Machado's application for CAT protection and conclude that the BIA did not err in finding that she failed to establish her eligibility for this protection.

The BIA determined that "the respondent did not establish [that] it is more likely than not she will be harmed by or at the instigation of, or with the consent or acquiescence of, a public official or other person acting in an official capacity." Government acquiescence is a necessary part of proving eligibility under the CAT. *See* 8 C.F.R. § 1208.18(a)(1). The government official in question need not have actual knowledge of the torture or persecution, but may demonstrate acquiescence by turning a blind eye to activities of private individuals. *Mulyani v. Holder*, 771 F.3d 190, 200 (4th Cir. 2014).

Whether a government acquiesces in persecution constitutes a question of fact reviewed for substantial evidence. *See Cabrera Vasquez v. Barr*, 919 F.3d 218, 222 (4th Cir. 2019). Factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quoting *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 245 (4th Cir. 2013)).

Substantial evidence supports the BIA's conclusions on Chicas-Machado's CAT application. On December 4, Chicas-Machado reported MS-13's efforts to recruit her to the police officers, and they promised to try to capture the gang members. She contends that the police's failure to apprehend the gang members before they threatened her again

19

on December 6 demonstrates government acquiescence.  We cannot agree.  When she left the country 12 days after her initial police report, Chicas-Machado had not been harmed, and she did not offer any evidence that the police colluded with MS-13 or otherwise acquiesced in the gang's activity.  With no such evidence, a reasonable adjudicator could find that there was no government acquiescence in her persecution.  We thus affirm the BIA's rejection of Chicas-Machado's CAT application and deny her petition for review on this issue.

IV.

The BIA properly held that Chicas-Machado was not eligible for CAT protection, and so we deny the petition for review as to the CAT claim.  But the BIA erred in not recognizing the nexus that Chicas-Machado established between the persecution she suffered and her religion.  As a result of that error, the BIA erred in determining that Chicas-Machado was not a refugee eligible for asylum.  Therefore, we grant the petition for review of her asylum and withholding of removal claims, vacate the BIA's order as to them, and remand the case for further proceedings consistent with this opinion.  Accordingly, the petition for review is

*GRANTED IN PART,*
*DENIED IN PART,*
*AND REMANDED.*

20

AGEE, Circuit Judge, concurring in part and dissenting in part:

Substantial evidence supports the BIA's determination that Chicas-Machado failed to demonstrate persecution on account of her religion for purposes of establishing eligibility for asylum (and withholding of removal). Separately, the nexus reasoning adopted by the majority here, and as reflected in some of this Court's earlier decisions, is an aberrant construction of immigration law as historically understood, untethered to the statutory text as written by Congress, and rejected by several of our sister circuits. Therefore, I respectfully dissent from that part of the majority opinion and would deny the petition for review in full.[1]

I.

Chicas-Machado testified before the IJ that she belonged to an evangelical church in El Salvador and would evangelize to young people in the community.[2] She believed that, as a result, MS-13 "hated" her and considered her an "enemy." A.R. 145, 188–89. Chicas-Machado also testified that the gang harassed her when they saw her in the streets and would "always insinuate that [she] had a very nice body and they could do whatever they pleased with [her] body." A.R. 152. Gang members told her that "they didn't care that [she] was Christian, that they could do with [her] whatever they pleased." A.R. 188.

---

[1] I agree with the majority that Chicas-Machado has not shown that she is entitled to CAT relief.

[2] Although the majority states that Chicas-Machado "eventually acted as the church's secretary," *ante* at 2, Chicas-Machado testified that she was "practicing" and "trying to become the secretary of the church" by "tak[ing] notes" during church meetings but that she "wasn't officially the secretary." A.R. 167.

Despite testifying that MS-13 members harassed her "constantly" for about a year, A.R. 172, Chicas-Machado identified only two occasions where gang members threatened her with any physical harm.

The first was on December 4, 2016, when two gang members approached her in a store and tried to recruit her as a lookout for police activity. Specifically, they told her that they "wanted [her] to collaborate with them" by informing them every time police officers were in the area. A.R. 146, 186. They told her that she wouldn't draw suspicion as a lookout for the gang because she was a Christian and "specifically" because of her affiliation with the church. A.R. 150; *see also* A.R. 146 ("They told me that because I was Christian and I used to belong to the secretary of a church, no one will suspect . . . me."), 169–70 (Government attorney: "[A]nd it was because you were a member of the church that [the gang] thought you would be undetected, right?" Chicas-Machado: "Yes."). After Chicas-Machado rebuffed their advances, the gang members sought to strong-arm her cooperation by threatening her with physical harm if she did not agree to assist the gang. *See* A.R. 170 (Government attorney: "And after you refused to work with them is when they threatened you, correct?" Chicas-Machado: "Yes."). The gang members never threatened to harm Chicas-Machado if she continued to attend church or otherwise continued to publicly express her religious beliefs. Following this encounter, Chicas-Machado reported the incident to the police.

The second time Chicas-Machado was threatened with physical harm took place two days later. Gang members came to her home and confronted her about the police report, stating that they knew what she had done and that they would rape and kill her if she didn't

22

leave her house immediately.[3] Once again, the gang members never threatened to harm her if she didn't stop practicing or communicating her religious beliefs. In fact, during this second encounter, the gang members never mentioned her religion. *See* A.R. 172 (Government attorney: "[D]id they mention anything to you about your religion during the second . . . interaction with them?" Chicas-Machado: "No[.]").

Thereafter, Chicas-Machado came to the United States and sought asylum, withholding of removal, and CAT protection. As to her asylum and withholding-of-removal claims, Chicas-Machado alleged persecution on account of her religion and on account of her membership in two proposed particular social groups. Because the majority's decision to vacate and remand turns on the religious-persecution asylum claim, I focus only on that claim.

In dismissing Chicas-Machado's appeal of the unfavorable IJ decision, the BIA found that Chicas-Machado's "evangelical Christian faith was tangential to the gang's motivation for threatening her." A.R. 4. The BIA specifically noted Chicas-Machado's testimony that the gang "wanted her assistance because no one would suspect she would be working with the gang based on her activity and conduct with the church" and that when the gang threatened her on the second occasion, "they did not mention anything about the fact that she was Christian." A.R. 4. The BIA thus concluded that the record evidence

---

[3] Chicas-Machado testified inconsistently on this point, first stating that gang members told her *not* to leave her home or else they would rape and kill her. A.R. 148, 160. But when later asked by the IJ about this issue, she testified that the gang members told her that "I should leave my house and if I didn't leave my house they [would rape and] kill me." A.R. 187.

supported the IJ's determination that "the gang was not motivated to stop or hinder her from practicing her religion[;] rather, they saw her as an asset they could exploit to further their criminal enterprise." A.R. 4.

In my view, substantial evidence supports the BIA's conclusion, and the petition for review should be denied.

## II.

To establish eligibility for asylum in the United States, an applicant must, among other things, demonstrate a nexus between the claimed persecution and a statutorily protected ground. *See* 8 U.S.C. § 1101(a)(42). The applicant satisfies this nexus requirement by proving that her protected status is "a central reason why she, and not some other person," was targeted for persecution. *Alvarez Lagos v. Barr*, 927 F.3d 236, 249 (4th Cir. 2019). Although the applicant doesn't have to show that the protected ground was "*the* central reason" for the persecution, the protected ground must be "more than an incidental, tangential, superficial, or subordinate reason." *Madrid-Montoya v. Garland*, 52 F.4th 175, 179 (4th Cir. 2022) (quoting *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 247 (4th Cir. 2017)).

The nexus determination is a factual issue, and judicial review of the agency's resolution of that factual issue is limited and "highly deferential." *Id.* (quoting *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020)). Under the applicable substantial-evidence standard, "our task is not to decide how we would rule in the first instance. Rather, we must uphold the BIA's finding unless no rational factfinder could reach the same conclusion." *Temu v.*

24

*Holder*, 740 F.3d 887, 891 (4th Cir. 2014); *see also Madrid-Montoya*, 52 F.4th at 179 ("[W]e cannot substitute our judgment for that of the agency's by reweighing the evidence and determining which of the competing views is more compelling." (cleaned up)).

### III.

Applying that highly deferential standard here is straightforward and, in my view, leads to the obvious conclusion that the BIA's no-nexus determination must be upheld.

### A.

The BIA determined that Chicas-Machado's religion was only "tangential to the gang's motivations for threatening her" because the record revealed that "the gang was not motivated to stop or hinder her from practicing her religion" but rather "saw her as an asset they could exploit to further their criminal enterprise." A.R. 4. Substantial record evidence supports that finding.

As the BIA noted, Chicas-Machado repeatedly testified that the gang members told her that they wanted her to be a police spotter for the gang because "[n]o one would suspect [her]" given her ties to the church. A.R. 150. But Chicas-Machado refused, and the gang responded by threatening to harm her if she didn't cooperate:

| | |
|---|---|
| Government attorney: | "[Y]ou said that they threatened you *in order to get you to collaborate with them*, correct?" |
| Chicas-Machado: | "Yes." |
| . . . | |
| Government attorney: | "And after you refused to work with them is when they threatened you, correct?" |
| Chicas-Machado: | "Yes." |
| . . . | |

25

| | |
|---|---|
| Government attorney: | "And you told the police that you had been threatened *because the gang wanted you to work with them and you wouldn't work with them*, right?" |
| Chicas-Machado: | "Yes." |

A.R. 160, 170 (emphases added).

Chicas-Machado then testified that the same two gang members later threatened her because they discovered that she reported the first encounter to the police. During this second interaction, her religion was *never* mentioned:

| | |
|---|---|
| Government attorney: | "[A]fter you filed the report, you got a threat again, correct?" |
| Chicas-Machado: | "Yes." |
| . . . | |
| Government attorney: | "And at that point they threatened you *because you filed the police report*, right?" |
| Chicas-Machado: | "Yes." |
| Government attorney: | "Did they say anything else to you?" |
| Chicas-Machado: | "Yes, they told me that they would kill me, but before they do that, they will rape me because I was pretty." |
| Government attorney: | "Okay, and they did that *because you had filed the police report*, right?" |
| Chicas-Machado: | "Yes." |
| Government attorney: | "Did they mention anything else to you?" |
| Chicas-Machado: | "No." |
| Government attorney: | "So they never mentioned your religion on the second threat. Is that right?" |
| Chicas-Machado: | "I knew that was the reason why because I was Christian." |
| Government attorney: | "That doesn't answer my question. My question was did they mention anything to you about your religion during the second . . . interaction with them?" |
| Chicas-Machado: | "No, but I know that's . . . the reason why." |

A.R. 170–72 (emphases added).

26

Consistent with the BIA's decision, then, the uncontroverted record evidence demonstrates that the gang threatened Chicas-Machado for two reasons only: (1) she refused to serve as a police spotter, and (2) she reported the gang's recruitment effort to the police. Because each threat was "entirely consistent with a motivation independent of" her religion, *Cedillos-Cedillos v. Barr*, 962 F.3d 817, 826 (4th Cir. 2020), substantial evidence supports the BIA's no-nexus finding.

That the gang previously publicly harassed Chicas-Machado and specifically referred to her religion and affiliation with the church in attempting to recruit her does not compel a contrary conclusion. As a general matter, "[t]he mention of religion in the fabric of the story [alone] is insufficient to establish a persecution claim." *Amanfi v. Ashcroft*, 328 F.3d 719, 727 (3d Cir. 2003); *cf. Madrid-Montoya*, 52 F.4th at 181 (stating that "not every threat that references a family member is made on account of family ties" (cleaned up)). This case is no different.

First, as to Chicas-Machado's testimony that the gang frequently harassed her when they saw her in the street, explicitly referencing her religion (in addition to her physical appearance), we have repeatedly said that, regardless of nexus, persecution under the INA requires more than "mere harassment." *Portillo Flores v. Garland*, 3 F.4th 615, 627–28 (4th Cir. 2021) ("Persecution involves the infliction or threat of death, torture, or injury to one's person or freedom .... [A]ctions must rise above the level of mere harassment to constitute persecution." (emphasis omitted) (quoting *Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005))); *see also Li*, 405 F.3d at 177 ("Persecution is an extreme concept that does not include every sort of treatment that our society regards as offensive." (citation

27

omitted)). Chicas-Machado specifically testified that she was never threatened with actual physical harm during these public instances of harassment. *See* A.R. 172 (Chicas-Machado: "I was constantly being harassed but I never received any direct threat before."), 183–84 (Government attorney: "[W]hen you said that the gang threatened you, every time that they saw you on the street . . . did you mean that they actually threatened harm to you?" Chicas-Machado: "No, they just insult[ed] me." Government attorney: "Okay, so when we're talking about threats of harm how many times did they threaten to do harm to you?" Chicas-Machado: "Two times." Government attorney: "The other times they were just mean to you?" Chicas-Machado: "Yes."). Thus, these earlier instances of harassment, even if on account of religion, fall short of religious *persecution* and, as a result, cannot serve as the basis for her claim.

Second, even accepting that the gang raised Chicas-Machado's religion and her ties to the church during the recruitment effort, the record shows that the gang ultimately threatened her solely for a reason independent of religion: her refusal to assist the gang. Under the plain text of the INA, it is the threatened harm—the *persecution*—that must be "on account of" a protected ground. *See* 8 U.S.C. § 1101(a)(42) (defining "refugee" as someone "unable or unwilling to return to" her home country "because of *persecution or a well-founded fear of persecution* on account of race, religion, nationality, membership in a particular social group, or political opinion" (emphasis added)). And we have held that threats of harm communicated only in response to a rejected gang-recruitment effort do not amount to persecution on account of a protected ground, whatever the gang's reason for targeting the applicant for recruitment in the first place. *See Cortez-Mendez v. Whitaker*,

28

912 F.3d 205, 210 (4th Cir. 2019) ("Flight from gang recruitment is not a protected ground under the INA."); *see also Contreras-Mejia v. Barr*, 815 F. App'x 694, 699 (4th Cir. 2020) (per curiam) (relying on *Cortez-Mendez* to uphold the BIA's conclusion that family membership was not a central reason for the applicant's persecution, which "was linked only to [the applicant's] *refusal to join the MS-13 gang*" (emphasis added)). So too here. Whatever the gang's motivation in targeting Chicas-Machado for *recruitment*, Chicas-Machado's religion was not a central reason why the gang targeted her for *persecution*, which it did only after—and *because*—Chicas-Machado refused to act as a police spotter.[4] Put differently, even if Chicas-Machado's religion was a reason why she, and not another person, was considered for gang recruitment (which is itself doubtful, *see infra* n.6), it was not a central reason for her persecution.

Our recent decision in *Cortez-Mendez* makes the point clear. There, the applicant—just like Chicas-Machado—was targeted "for gang recruitment." 912 F.3d at 207. Gang members "harassed him and threatened him with death," telling him that "if he did not become a gangster, they were going to kill him." *Id.* (cleaned up). Cortez-Mendez fled to the United States seeking withholding of removal based on his membership in a particular social group—his family ties to his disabled father. *Id.* at 207–08. The IJ denied the application in part because Cortez-Mendez failed to show that the threats he received were

---

[4] To be clear, nothing in the record suggests that the recruitment effort itself amounted to persecution. There's no evidence, for example, that the gang sought out Chicas-Machado as a lookout to punish her for or to change her religious beliefs.

29

on account of his family ties to his father. *Id.* at 208. The BIA affirmed that no-nexus finding. *Id.*

Finding no error, we denied the petition for review. We found unpersuasive Cortez-Mendez's argument that "the gangs persecuted him because his father's disabilities caused Cortez-Mendez to be poor, vulnerable, and an easy mark." *Id.* at 210 (internal quotation marks omitted). Rather, we determined that, consistent with the IJ's and BIA's decisions, ample record evidence showed that he was threatened not because of his father's disabilities and resultant poverty but on account of "his own rejection of gang membership." *Id.* We noted that "[a]t most, Cortez-Mendez demonstrated that the gangs may have *targeted him* [*for recruitment*] because of his [family ties and] poverty but *only threatened him because he would not join their ranks*." *Id.* (emphases added).

Here, the asserted protected ground is religion rather than membership in a particular social group, but the same reasoning applies and with equal force. The undisputed record evidence demonstrates that the gang sought to recruit Chicas-Machado because it viewed her as a potentially favorable candidate to act as a police spotter. She refused. Only then did the gang threaten her with harm. And it did so, according to Chicas-Machado's own unequivocal testimony, not because of her religion but *because she refused to assist the gang. See, e.g.*, A.R. 160 (Government attorney: "[Y]ou said that they threatened you *in order to get you to collaborate with them*, correct?" Chicas-Machado: "Yes." (emphasis added)). That the gang mentioned Chicas-Machado's religion in attempting to recruit her does not establish that she was threatened *because of* her religion, just as the gangs' knowledge and mention of Cortez-Mendez's disabled father was

insufficient to establish that those gangs threatened Cortez-Mendez *because of* his relation to his father. *See Cortez-Mendez*, 912 F.3d at 210 ("Even if [the gangs] knew about [Cortez-Mendez's father's] disabilities, it does not follow that they [threatened] Cortez-Mendez *because of* his relation to his disabled father.").

All things considered, there should be no doubt that the BIA's no-nexus finding was supported by substantial evidence, and therefore our course should be to uphold that finding.[5]

## B.

Although the previous discussion provides more than a sufficient basis to affirm the BIA's no-nexus determination, it bears mention that the agency's decision comports with the long-established understanding of what is and isn't "religious persecution" in the immigration context.

Religious persecution can take many forms, but "a core principle" is the suppression of religious expression: the persecutor seeks to prevent the victim from "practic[ing] his religion openly" or altogether. *Ali v. U.S. Att'y Gen.*, 931 F.3d 1327, 1334 (11th Cir. 2019); *accord Shi v. U.S. Att'y Gen.*, 707 F.3d 1231, 1236 (11th Cir. 2013) ("[T]he suppression of religious practice is precisely the kind of persecution from which Congress sought to protect refugees."); *Woldemichael v. Ashcroft*, 448 F.3d 1000, 1003 (8th Cir. 2006) (explaining that religious persecution occurs where religious adherents "are prevented from

---

[5] According to the majority, the IJ and the BIA misinterpreted Chicas-Machado's testimony regarding the gang members' comments that they "didn't care that [she] was Christian." A.R. 188; *see ante* at 16–17. Even accepting that premise, substantial evidence still supports the BIA's no-nexus finding for the reasons explained in detail above.

practicing their religion"); *Muhur v. Ashcroft*, 355 F.3d 958, 961 (7th Cir. 2004) (describing religious persecution as an effort "to drive [religious] adherents underground in the hope that their beliefs will not infect the remaining population").

The history and purpose of our nation's asylum laws, as written by Congress, confirm this view of religious persecution. "The asylum provisions of the INA were incorporated into law in the Refugee Act, Pub. L. No. 96-212, 94 Stat. 102 (1980)." *Shi*, 707 F.3d at 1236. And as the Supreme Court has recognized on multiple occasions, "one of Congress' primary purposes in passing the Refugee Act was to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees . . . as well as the [1951] United Nations Convention Relating to the Status of Refugees." *Neguise v. Holder*, 555 U.S. 511, 520 (2009) (cleaned up); *accord M.A. A26851062 v. U.S. Immigr. & Naturalization Servs.*, 858 F.2d 210, 214 n.3 (4th Cir. 1988) ("The Refugee Act of 1980 was passed to bring the law of the United States in conformity with the United Nations['] treatment of refugees[.]"). For that reason, we have said that the United Nations Handbook on Procedures and Criteria for Determining Refugee Status "provides significant guidance in interpreting the Refugee Act." *M.A. A26851062*, 858 F.2d at 214 (citing *Immigr. & Naturalization Servs. v. Cardoza-Fonseca*, 480 U.S. 421, 439 n.22 (1987)). That Handbook states in clear terms that religious persecution is all about restrictions on the "right to *practise* [*one's*] *religion*." Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ¶ 54 (1979, reissued 2019) (emphasis added). For example, the Handbook explains that "[p]ersecution for reasons of religion" comprises "*prohibition* of membership of a religious community, of

worship in private or in public, [or] of religious instruction" as well as "serious measures of discrimination imposed on persons *because they practise their religion* or belong to a particular religious community." *Id.* ¶ 72 (emphases added) (internal quotation marks omitted).

This same understanding of religious persecution established by the Handbook should guide us here, just as it did Congress in enacting the Refugee Act and as it does other courts in interpreting it. *See, e.g.*, *Zhang v. Ashcroft*, 388 F.3d 713, 720 (9th Cir. 2004) ("When defining religious persecution, we are guided by the analysis set forth in the [Handbook]."). Yet the majority snubs this foundational document, remarkably declaring, without any citation to statutory text or legislative history, that it imposes too narrow a standard under the INA and thus stands at odds with what Congress intended. Quite the opposite. Applying the Handbook's meaning of religious persecution is entirely consistent with the Supreme Court's and our own teachings about how the INA's asylum provisions ought to be construed: with appreciation of and respect for the historical underpinnings of their enactment. That isn't a "policy argument[]" as the majority opines. *Ante* at 16. It is adherence to the historical basis upon which Congress wrote the asylum laws we consider here.

Paying heed to the historical and widely accepted understanding of religious persecution, which the majority fails to confront, only bolsters the conclusion that we should not disturb the BIA's decision. No suppression or attempted suppression of religious expression happened here. The gang never threatened to harm Chicas-Machado if she didn't renounce her faith. Nor did it threaten her with harm if she didn't abandon her

33

religious practices. Indeed, this case bears none of the hallmarks of a typical religious-persecution case. *See, e.g.*, *Sorto-Guzman v. Garland*, 42 F.4th 443, 446 (4th Cir. 2022) (religious nexus satisfied where gang members physically attacked the applicant as she was leaving a church service, tore a crucifix medallion from her neck, "and threatened to kill her if she ever wore it or attended church again"); *Shi*, 707 F.3d at 1236, 1239 (religious nexus satisfied where Chinese police raided a private at-home Christian meeting, arrested the applicant and others and confiscated the congregants' bibles, detained and interrogated the applicant for days and threatened to beat him, handcuffed the applicant to an iron bar outside the police station and left him overnight in the rain, and made the applicant promise not to attend any more Christian meetings); *Jiang v. Gonzales*, 485 F.3d 992, 994, 997 (7th Cir. 2007) (religious nexus satisfied where Chinese police raided a private at-home Christian meeting, arrested the applicant and confiscated all his religious materials, repeatedly beat the applicant, and prohibited the applicant from attending future meetings).

In nonetheless forcing this case into the religious-persecution box, the majority points to Chicas-Machado's affiliation with the church and her evangelical efforts in the community, including "spreading the word of God, acting as the church's secretary, and telling young people to attend church," and concludes that the gang's targeting Chicas-Machado necessarily restricted those practices. *Ante* at 14. That is simply wrong. The record evidence clearly establishes that the gang never persecuted Chicas-Machado *because she performed these activities*, nor did it ever order her to *refrain from practicing them*. Thus, any "restriction" of religious exercise that the majority perceives is one of its own devising.

34

It is a further mischaracterization by the majority to say that I would require gang members to "phrase a threat as an ultimatum or a verbal command to stop practicing her religion" without regard to any potential "chilling effect" that a persecutor's threats or actions might have on the applicant. *Ante* at 15. To the contrary, I acknowledge that an applicant might demonstrate persecution on account of religion if she can show that she was singled out for some form of disparate treatment because of her religion and that such treatment reasonably chilled her religious practices. *See* Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ¶ 72 (identifying as a form of religious persecution "serious measures of discrimination imposed on persons because they practise their religion or belong to a particular religious community"). But the record here is devoid of any testimony from Chicas-Machado—or any other evidence—that she in fact experienced any such "chilling effect." The majority says otherwise, musing that the "persecution so chilled Chicas-Machado's religious practice that she fled her home, leaving behind her church . . . precisely because of MS-13's threats of violence." *Ante* at 16 n.7. Wrong again. As detailed above, Chicas-Machado's testimony made clear that her decision to flee her home was based on the threat she received in response to her reporting the gang's recruitment effort to the police. Her religion played no role in that threat or in her reason for fleeing. *See* A.R. 170–72, 187. Thus, not only is there no evidence that the gang ordered Chicas-Machado to cease or alter her religious practices or beliefs, but there is also no evidence that Chicas-Machado's relevant encounters with the gang—neither of which was actually concerned

35

with Chicas-Machado's religion—had any "chilling effect" on her exercise of those practices or beliefs.

## C.

Unconvinced by the overwhelming record support for the BIA's decision, the majority erroneously concludes that Chicas-Machado's religion was at least one central reason why the gang "target[ed] her" for persecution. *Ante* at 6. In doing so, the majority ignores not only this Court's precedent but also the distinction between separate protected grounds governed by separate legal standards.

To begin, by focusing on the gang's mention of Chicas-Machado's religion during the initial encounter, the majority conflates a reason why the gang sought to *recruit* her with the reason why it actually *threatened* her. As already explained, that distinction is key, because the INA is concerned only with the latter.

The BIA's decision correctly reflected this distinction. The BIA explained that the gang wanted to *recruit* Chicas-Machado "because no one would suspect she would be working with the gang based on her activity and conduct with the church" and because "they saw her as an asset they could exploit to further their criminal enterprise." A.R. 4. But the BIA specifically found that the gang *threatened* Chicas-Machado for reasons entirely independent of her religion: "[Chicas-Machado's] claimed past and feared future *harm* is not on account of her religion. Her evangelical Christian faith was tangential to the gang's motivations for *threatening* her." A.R. 4 (emphases added). Thus, the BIA properly

36

understood that the relevant inquiry was whether the gang's motivation for *threatening* Chicas-Machado—not recruiting her—was on account of religion.[6]

But because it misconstrues the proper analysis, the majority mischaracterizes the BIA's decision. According to the majority, "the motive for the gang's *persecution* that the BIA recognized" was Chicas-Machado's "use as a potential asset to the gang." *Ante* at 6 (emphasis added). That mischaracterization then serves as a springboard for the majority to conclude that such "motive for persecution" was "inextricably intertwined with [Chicas-Machado's] religion." *Id.*

Properly focusing, as the BIA did, on the reasons for the *threatened harm* as reflected in Chicas-Machado's own testimony plainly reveals the absence of a religious nexus. Chicas-Machado repeatedly testified that the gang threatened her *because she refused to assist the gang*. Consistent with our decision in *Cortez-Mendez*, that refusal,

---

[6] Notably, based on the plain language of its decision, the BIA did not explicitly find that the gang's decision to target Chicas-Machado for *recruitment* was even on account of religion. And in fact, there's good reason to doubt that it was. As Chicas-Machado testified, the gang specifically told her that it wanted her to be a lookout because she wouldn't draw suspicion. Thus, the gang approached Chicas-Machado not because of what *she* believed but because of what it thought *other people believed about her*. True, the gang's subjective belief concerning Chicas-Machado's standing in the community stemmed from her outwardly expressed faith and her ties to a local church. But Chicas-Machado's religion was merely tangential to the gang's ultimate goal—securing the assistance of someone who wouldn't attract suspicion as a lookout for the gang. There is nothing unique about religion in that sense. Indeed, religious adherents do not have a monopoly on the "persons beyond reproach" category. There are all sorts of individuals in a given community that could be deemed trustworthy and above suspicion regardless of religious affiliation. But even assuming the gang's motivation for targeting Chicas-Machado for recruitment can fairly be said to have been on account of her religion, the determinative question, as already established, is not why the gang sought Chicas-Machado's assistance but why the gang ultimately threatened her with harm.

37

which alone triggered the gang's threats, constitutes the sole, non-religious basis for the persecution Chicas-Machado faced. *See Cortez-Mendez*, 912 F.3d at 211 ("Cortez-Mendez . . . has provided no evidence that the gangs threatened him because of his father's disabilities. Instead, he testified that *his rejection of gang membership was the impetus for* [*the threats*]." (emphasis added)); *see also id.* ("The INA does not protect every person who rejects gang recruitment efforts."). Chicas-Machado's religion was no more "inextricably intertwined" with the persecution that she faced than Cortez-Mendez's family ties to his disabled father was "inextricably intertwined" with the persecution that he faced.

The majority contends that our decision in *Cruz v. Sessions*, 853 F.3d 122 (4th Cir. 2017), "expressly rejected" this line of reasoning. *Ante* at 9. But *Cruz* involved critically distinct facts.

In *Cruz*, the petitioner's husband[7] worked for a man who, unbeknownst to the petitioner and her husband, was a member of organized crime groups in Honduras and Colombia that trafficked drugs and guns. 853 F.3d at 125. Once the petitioner's husband learned the true nature of his employer's business, he relayed that information to the petitioner and told her that he planned to quit his job. *Id.* But before he could sever his employment relationship, he went on a business trip with his employer from which he never returned. *Id.* In investigating her husband's disappearance, the petitioner, along with the husband's uncle, questioned the husband's employer about his whereabouts. *Id.* The employer told them to "stop asking questions." *Id.* When the petitioner and the husband's

---

[7] The petitioner and her "husband" weren't legally married, but the IJ found that the two cohabitated and "were considered a married couple." *Cruz*, 853 F.3d at 126.

uncle indicated that they would file a police report, the employer "threatened that they would suffer the same fate" as the petitioner's husband. *Id.* The petitioner initially continued her investigation, drawing further threats from the employer. *Id.* Those threats ultimately proved effective as the petitioner "assured" the employer "that she had no intention of contacting the police regarding [the employer] or her husband's disappearance." *Id.* Nonetheless, the threatening behavior persisted. Over the next two years, the petitioner "observed [the employer] and his associates loitering outside her home. During these incidents, they brandished and fired weapons, and threatened to kill [the petitioner] and her children." *Id.* They even killed the petitioner's dogs. *Id.* As a result of these ongoing threats, the petitioner came to the United States with one of her children. *Id.* at 125–26. Even after she had fled the country, the husband's employer "continued to inquire about her whereabouts." *Id.* at 126.

The IJ denied the petitioner's family-ties asylum claim, concluding that the "main reason" the employer threatened the petitioner was to "deter her from contacting the police." *Id.* The BIA agreed with the IJ, supplementing the IJ's decision with its own and finding no nexus between the petitioner's claims and a protected status.

We vacated that determination, holding that the record compelled a conclusion that the employer's threats were motivated "in at least one central respect" by the petitioner's family ties to her husband. *Id.* at 129. But our holding did not rest simply on the notion that the petitioner's "familial relationship . . . prompted [the petitioner] to confront the employer and express her intent to contact the police." *Ante* at 10. We went on to identify

39

two other significant factors that should have been part of the agency's consideration and were vital to our holding.

First, we stressed that the IJ's no-nexus finding could not be squared with the record as a whole. According to the IJ, the employer threatened the petitioner only to deter her from contacting the police. But the record showed that even after the petitioner explicitly promised the employer that she would not contact the police, the employer continued to threaten the petitioner and her children "over *a period of two years* at her home," "the center of life for [the petitioner's husband] and his nuclear family." *Cruz*, 853 F.3d at 129 (emphasis added). This evidence undermined the IJ's identified basis for the persecution. Indeed, had the IJ been correct that the employer was threatening the petitioner only to ensure her silence, then one would have expected the employer's threatening behavior to abate upon receiving assurance from the petitioner that she wouldn't contact the police. So the fact that the threats continued and even escalated for *two years* thereafter demonstrated some other motivation underlying the threats. *See id.*; *accord Vazquez-Guerra v. Garland*, 7 F.4th 265, 269–70 (5th Cir. 2021) (distinguishing *Cruz* on the same basis).

That leads to *Cruz*'s second critical point of distinction: the record contained "extensive evidence" that a central motivation for the persecution stemmed from the information that the petitioner obtained solely because of her relationship with her husband. 853 F.3d at 130. Consistent with the petitioner's own testimony, the record "*unequivocally* demonstrate[d] that [the petitioner] knew about [the employer's] involvement with drugs and firearms trafficking *as a result of her husband's communications with her*." *Id.* (emphases added). And there was ample "circumstantial evidence [that] compel[led] a

40

conclusion that [the employer] at least suspected that [the petitioner] had such knowledge *based on her marital relationship with* [*her husband*]." *Id.* (emphasis added); *see also id.* (discussing IJ-credited expert testimony opining that the petitioner "was targeted because '[the employer] either knew or suspected that she had information about his criminal activities'"). Yet neither the BIA nor the IJ properly accounted for this evidence. Had they done so, the Court said, they would have been compelled to conclude that "because of [the petitioner's] relationship with her husband, she was more likely than others to search for him and to contact the police based both on her knowledge of [the employer's] criminal activities and her husband's suspicious disappearance." *Id.*

The case at bar is not like *Cruz*. Nothing in the record before us contradicts or otherwise undermines the BIA's finding that the threatened harm to Chicas-Machado stemmed only from a reason independent of a protected ground—as meticulously explained above—let alone compels a contrary conclusion. Further, there is no equivalent "extensive evidence" here demonstrating that the gang persecuted Chicas-Machado because of her religion, whether as one of several "central" factors or otherwise. To the contrary, the *only* evidence touching on the gang's reasons for threatening Chicas-Machado came from Chicas-Machado herself, who explicitly testified that the gang threatened her only because she rebuffed its recruitment effort and because she reported that recruitment effort to the police.

But if any doubt remains, one need look no further than *Cortez-Mendez*, which turned on facts strikingly similar to those here. Indeed, both there and here, a gang attempted to recruit the applicant based on a particular trait that the gang found attractive,

41

but the applicant provided no evidence that the gang actually persecuted him or her for any reason other than his or her rejection of gang membership. Given this unmistakable parallelism, *Cortez-Mendez* should control here.[8]

Instead, the majority breaks new ground (and expressly acknowledges doing so) by citing two out-of-circuit, non-argued unpublished decisions—all in a footnote. *Neither* decision provides support for the majority's holding.

The first case the majority relies on, *Azurdia-Hernandez v. U.S. Attorney General*, 812 F. App'x 935 (11th Cir. 2020), involved a Guatemalan applicant and his mother who a local gang attempted to extort by demanding that they assist the gang in various ways. *Id.* at 937. The gang told the applicant and his mother, both practicing Christians, that it trusted them not to cheat or steal from the gang because of their religion. *Id.* In vacating the BIA's and IJ's rulings that the applicant failed to establish a religious nexus, the Eleventh Circuit found that "the BIA and the IJ failed to give reasoned consideration to and make adequate findings about Petitioner's religion-based persecution claim." *Id.* at 939 (internal quotation marks omitted). The court *expressly declined* to hold that an asylum applicant demonstrates persecution on account of religion "based on evidence that he was

---

[8] The majority fails to meaningfully distinguish *Cortez-Mendez*. Devoting only a few sentences to its discussion of that case, the majority fails to grapple with its central holding: persecution on account of rejection of gang recruitment does not afford relief under the INA. *See* 912 F.3d at 210. It is also telling that the *Cortez-Mendez* Court had the benefit of the *Cruz* decision, which was issued less than two years earlier—indeed, *Cruz* is cited in *Cortez-Mendez*, albeit in the standard-of-review discussion—yet *Cruz* in no way altered *Cortez-Mendez*'s outcome. This further shows that *Cruz* and *Cortez-Mendez* proceeded along separate yet reconcilable analytical paths. And as already established, this case should follow in the steps of *Cortez-Mendez*.

42

targeted for forced labor or some other oppressive treatment because the persecutor perceived some positive attribute . . . associated with the persecuted person's religion that would serve the persecutor's goals." *Id.*

The second case, *Kasama v. Gonzales*, 219 F. App'x 28 (2d Cir. 2007), provides even less support. There, a Sierra Leone applicant suffered physical harm after he resisted a rebel group's effort to conscript him into the rebels' labor force. *Id.* at 30. In seeking asylum, the applicant asserted that he had been persecuted on account of his political opinion and religion. *Id.* The IJ and the BIA denied the claims, but the Second Circuit vacated their decisions. *Id.* Among other errors, the court explained, the IJ and the BIA failed to consider, as they were required to do under Second Circuit case law, whether the applicant "was subjected to *disproportionate punishment* for resisting conscription" on account of his political opinion or religion. *Id.* (emphasis added); *see also id.* ("Forced conscription can constitute persecution if the applicant is subjected to *a disproportionate punishment* for failing to serve, on account of a protected ground." (emphasis added)). Finding that the applicant made "some showing that the persecution he faced is at least partly based on" a protected ground, but not specifying which, the court remanded to the agency for further consideration of the applicant's claims. *Id.* at 31 (emphasis omitted).

Thus, as a clear reading shows, these two out-of-circuit decisions, which aren't binding in their respective circuits, simply do not carry the analytical weight attributed to them by the majority.

But even if these nonprecedential decisions lend support for the majority's position—they don't—it wouldn't matter because they "cannot alter the clear rule set forth

43

in the *published* [*Cortez-Mendez*] opinion[] discussed above." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 401 n.10 (4th Cir. 2014) (Motz, J.). And under that clear rule, where, as here, the evidence reveals that an applicant was threatened with harm only in response to her refusal to join or assist a gang, the applicant has not established persecution on account of a protected ground. *See Cortez-Mendez*, 912 F.3d at 210.

Nonetheless, the majority doubles down on its contrary holding, attempting to analogize this case to our decisions in *Hernandez-Avalos v. Lynch*, 784 F.3d 944 (4th Cir. 2015), and *Salgado-Sosa v. Sessions*, 882 F.3d 451 (4th Cir. 2018). Doing so only underscores the majority's error.

In *Hernandez-Avalos*, we held that an applicant who was threatened by a gang because she refused to allow her son to join the gang was persecuted on account of her family ties to her son. 784 F.3d at 950. We reasoned that the applicant's "relationship to her son is why she, and not another person, was threatened with death if she did not allow him to join [the gang]." *Id.* Relying heavily on *Hernandez-Avalos*, we held in *Salgado-Sosa* that an applicant demonstrated persecution on account of family ties where his stepfather resisted a gang's extortion attempts and the gang retaliated by attempting to kill the stepfather's entire family, including the applicant. 882 F.3d at 457–59.

The majority posits that as the applicants in these two cases were persecuted on account of their family ties, Chicas-Machado was persecuted on account of her "membership in, service for, and ties to" her church, thereby establishing the requisite nexus. *Ante* at 8. Those family-ties cases, however, have no logical application here.

44

In those cases, the gang threatened the applicant to achieve a desired outcome concerning a separate targeted individual related to the applicant. In *Hernandez-Avalos*, the gang targeted the applicant's son for recruitment, and the gang threatened the applicant only to achieve its ultimate objective regarding the son. In *Salgado-Sosa*, the gang sought to kill the applicant only because the gang was motivated to retaliate against the applicant's stepfather, who resisted the gang's extortion efforts. But here, there is no targeted-family-member analogue. The majority says that the gang targeted Chicas-Machado because of her "ties to the church." *Ante* at 8. Aside from the fact that Chicas-Machado and the church are not family members, there is no evidence in the record that the gang sought out Chicas-Machado to further some goal with respect to *the church*. Thus, there is simply no coherent factual comparison between those cases and this one.

More importantly, the relevant nexus inquiry for a *religious-persecution* claim is not whether the applicant has "ties to" a church, or even whether the applicant is a member of or otherwise performs some kind of service for a church (which are little more than tautologies of "ties to"), but whether the applicant has shown persecution on account of her religious beliefs or practices. I am not aware of, and the majority doesn't point to, any decision from this Court or the Supreme Court holding that an individual's mere "ties to" a church, or any religious organization for that matter, satisfies the nexus requirement in a case of alleged religious persecution. That's not surprising because such a test would produce absurd outcomes. Indeed, under the majority's "ties to a church" logic, a self-proclaimed agnostic employed by a church in some administrative, non-religious capacity—like a janitor, a bookkeeper, or even a secretary—could show the requisite nexus

45

for a religion-persecution claim given that person's "ties to" or "service for" the church. Such a result would be foreign to any recognized understanding of what it means to be persecuted on account of religion and demonstrates just how far afield the "ties to" framework deviates from the roots of religious-persecution claims.

Not even Chicas-Machado urges us to go that far. She *never* raised *Hernandez-Avalos* or *Salgado-Sosa* in the argument section of her brief or at oral argument, let alone endeavored to liken those cases to hers.[9] Rather, she argued only that "[h]er decision to preach to youth and dissuade them from joining the [gang] was her expression of the Word of God, and was at least one central reason for the [persecution] she suffered and fears." Opening Br. 20. And *that* argument is plainly belied by the record as thoroughly explained above.[10]

---

[9] Chicas-Machado's brief contains a single citation to *Hernandez-Avalos* in the standard-of-review section, quoting oft-used language reciting the substantial-evidence standard.

[10] To nonetheless justify its reliance on *Hernandez-Avalos* and *Salgado-Sosa*, the majority is eager to note that the Government did not cite *Cortez-Mendez* in its own argument. True enough. But the Government had no reason to cite *Cortez-Mendez* as it was responding only to the argument that Chicas-Machado *actually made*. And *that* argument, which takes up less than three pages of her brief, has no semblance to *Hernandez-Avalos'* reasoning and is so lacking in evidentiary and analytical support that not even the majority relies on it to grant the petition. How was the Government to know that the majority would advance an entirely new nexus theory on Chicas-Machado's behalf, let alone respond to it?

What's more, given the BIA's decision, it is Chicas-Machado's burden to affirmatively demonstrate the requisite nexus; it is not the Government's burden to demonstrate the absence of nexus. By relying on *Hernandez-Avalos* and otherwise transforming Chicas-Machado's argument well beyond its original ambit, the majority decidedly carries that burden for her, devising a novel framework to bridge the wide gap between her evidence and the showing required to obtain relief. In any event, whether the Government cited *Cortez-Mendez* or not, that case should control the nexus issue here. (Continued)

*Hernandez-Avalos* and its progeny have no application here.[11]

IV.

If, however, the majority is right (it isn't) that *Hernandez-Avalos* provides the proper nexus framework for religious-persecution claims and dictates the decision reached today, the problem is more fundamental: *Hernandez-Avalos* is indefensible as to its nexus reasoning and should be overturned by this Court sitting en banc or by the Supreme Court to resolve a circuit split.

To understand why, it is necessary to return to the text and history of the INA. To qualify for asylum, an applicant must demonstrate that a protected ground was "at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i).

The INA doesn't define the term "central reason," so it must be interpreted according to its ordinary meaning. *See Immigr. & Naturalization Servs. v. Elias-Zacarias*, 502 U.S. 478, 482 (1992). "Dictionaries define the term 'central' as being 'of primary importance'; the terms 'essential' and 'principal' are synonyms." *Parussimova v. Mukasey*,

___

The majority is also quick to point out that *Cortez-Mendez* too involved a family-ties claim. But our reasoning for denying relief in that case transcends the particular protected ground asserted there. Nothing about that decision hinged on the nature of the family-ties claim at issue. *Cf. Rivera-Barrientos v. Holder*, 666 F.3d 641, 647 (10th Cir. 2012) (noting that although "[s]ome evidence" supported the petitioner's claim that she was attacked by a gang because of her political beliefs, the BIA could properly conclude that the central reason for the attack was "her refusal to join the gang"). The same cannot be said of the majority's reliance on *Hernandez-Avalos* and *Salgado-Sosa*.

[11] As explained below, a number of our sister circuits have explicitly repudiated *Hernandez-Avalos*' reasoning within the family-ties context itself, which provides an even greater cause for concern about extending it to a different protected ground with a very different historical nexus.

47

555 F.3d 734, 740 (9th Cir. 2009) (citations omitted); *see also* Webster's Third New International Dictionary 363 (2002) (defining "central" as "belonging to the center as most important part"; "basic, essential, principal, dominant"; "not peripheral or incidental"). Put in context, therefore, a "central reason" means "a reason of primary importance to the persecutors, one that is essential to their decision to act." *Parussimova*, 555 F.3d at 741. "[I]t must play more than a minor role that is neither incidental nor tangential to another reason for the harm or a means to a non-protected end." *Thayalan v. Att'y Gen.*, 997 F.3d 132, 143 (3d Cir. 2021) (citation omitted).

Aside from the plain text, this same understanding of "central reason" is readily apparent given the context in which Congress adopted it. The "central reason" standard was added to the statutory requirements twenty-five years after the Refugee Act's passage, when Congress enacted the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B., 119 Stat. 231. Before the REAL ID Act, Congress had not defined the contours of an asylum applicant's burden of proof in cases involving mixed motive—that is, where the applicant was persecuted on account of both protected and unprotected grounds. *Guzman-Vasquez v. Barr*, 959 F.3d 253, 270 (6th Cir. 2020); *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 129 (3d Cir. 2009). Filling in the gaps, the BIA and the courts, including our own, adopted an "at least in part" standard: an asylum applicant need show only that the persecution was caused "at least in part" by the applicant's membership in a protected class. *See, e.g.*, *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 453 n.12 (4th Cir. 2007); *Cece v. Holder*, 733 F.3d 662, 672 & n.6 (7th Cir. 2013) (en banc); *Shaikh v. Holder*, 588 F.3d 861, 864 (5th Cir. 2009); *Ndayshimiye*, 557 F.3d at 129; *Parussimova*, 555 F.3d at 739–40; *Singh v. Mukasey*,

48

543 F.3d 1, 5 (1st Cir. 2008); *In re S-P-*, 21 I. & N. Dec. 486, 496 (B.I.A. 1996). By enacting the REAL ID Act and its "one central reason" standard, however, Congress not only superseded the "at least in part" test, but it "raised the burden of proof an asylum applicant must satisfy." *Shaikh v. Holder*, 702 F.3d 897, 902 (7th Cir. 2012); *accord Parussimova*, 555 F.3d at 740 (explaining that the "one central reason" standard "places a more onerous burden on the asylum applicant than the 'at least in part' standard [the court] previously applied"); *Abdel-Rahman*, 493 F.3d at 453 n.12 (observing that the REAL ID Act's addition of the "one central reason" standard to the INA "narrowed" this Court's previous "mixed-motive standard," under which "an asylum applicant need only show that the alleged persecutor is motivated in part to persecute him on account of the protected trait" (cleaned up)). Congress' inclusion of the "one central reason" language is therefore significant: rather than codify the "at least in part" test, Congress instituted a completely new standard that, by its plain terms, requires a more demanding nexus showing. That was not mere happenstance; it was by design. Thus, in passing the REAL ID Act, Congress evinced an obvious "intent to elevate the applicant's burden rather than to maintain or to reduce it." *Parussimova*, 555 F.3d at 740; *see also Matter of N-M-*, 25 I. & N. Dec. 226, 531 (B.I.A. 2011) (explaining that Congress codified the "one central reason" standard "to create a uniform standard for adjudicating cases in which the alleged persecutor had more than one plausible motive for harming the victim" because it was "concerned" that the "at least in part" standard had "undermined a proper analysis of mixed motive cases" (quoting H.R. Rep. No. 109-72, at 163 (2005))).

49

We have acknowledged this elevated burden exists but in practice have often paid it only lip service. Ironically, this elevated standard has been used at times as a means for *relaxing* a petitioner's burden, the exact opposite of what Congress intended.[12]

*Hernandez-Avalos* is the prime example. Recall, in that case, gang members came to the petitioner's home and told her that because her twelve-year-old son was coming of age, it was time for him to join the gang. 784 F.3d at 947. The petitioner refused to allow her son's recruitment, prompting the gang members to threaten her with death by pointing a gun to her head. *Id.* The gang members later repeated their threats on a separate occasion; the petitioner again refused. *Id.* Thereafter, the petitioner and her son came to the United States to seek asylum. *Id.* at 946–47. The IJ concluded that the petitioner had not shown persecution on account of a protected ground. *Id.* at 948. In upholding that decision, the BIA held that the petitioner "was not threatened because of her relationship to her son (i.e. family), but rather because she would not consent to her son engaging in criminal activity." *Id.* at 949. On appeal before this Court, the government defended the BIA's decision, adding that "the fact that the person blocking the gang members' recruitment effort was their membership target's mother was merely incidental to the recruitment aim." *Id.*

Although the record fully supported the BIA's conclusion, the panel held to the contrary. The panel correctly recited the "one central reason" standard, noting that an

---

[12] Some of our cases, however, have faithfully applied the correct standard. *See, e.g.*, *Madrid-Montoya*, 52 F.4th at 183–86 (holding that the petitioner's family ties to her deceased husband was not one central reason for the persecution she faced but was only incidental to the persecutors' ultimate goal of preventing her from asserting her perceived ownership of the deceased husband's land).

asylum applicant claiming persecution on account of family ties "must demonstrate that these ties are more than an incidental, tangential, superficial, or subordinate reason for his persecution." *Id.* (cleaned up). Nonetheless, its analysis soon abandoned that standard and simply announced that the BIA applied "an excessively narrow reading" of the INA because its "conclusion that these threats were directed at [the petitioner] not because she is his mother but because she exercises control over her son's activities [drew] a meaningless distinction under the[] facts." *Id.* at 949–50.

But the BIA's holding was anything but meaningless; it accurately noted that the petitioner's familial relationship to her son was not a central—that is, a dominant or essential—reason for the persecution. Indeed, the record demonstrated that the gang's threats to the petitioner was nothing more than a means to an end. It did not matter that the petitioner was the mother of the gang's target. The gang would have persecuted any person purporting to stand in the way of the son's recruitment. Suppose, for example, that one of the son's friends or teachers, or some other non-relative member of the community, sought to prevent his recruitment by the gang and likewise were met with retaliatory threats. *None* of those individuals would have a valid asylum claim. That is, even if one of those non-family members engaged in the same anti-recruitment conduct and was met with the same threats as the mother, he or she would be out of luck. In that scenario, it simply cannot be the case that the petitioner's familial relationship was anything more than incidental to the

51

gang's threats.[13] Again, the petitioner was nothing more than a means to an unprotected end. And as several of our sister circuits have recognized, that does not establish a valid basis for asylum. *See Sanchez-Castro v. U.S. Att'y Gen.*, 998 F.3d 1281, 1287 (11th Cir. 2021) ("Like the [BIA], we distinguish persecution of a family as a means to an unrelated end from persecution based on animus against a family *per se*. Where a gang targets a family only as a means to another end, the gang is not acting because of who the family is; the identity of the family is only incidentally relevant." (internal citation omitted)); *Orellana-Recinos v. Garland*, 993 F.3d 851, 856 (10th Cir. 2021) ("[M]embership in a particular social group should not be considered a *motive* for persecution if the persecutors are simply pursuing their distinct objectives and a victim's membership in the group is relevant only as a means to an end—that is, the membership enables the persecutors to effectuate their objectives."); *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1038 (6th Cir. 2019) ("The fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground." (quoting *Matter of L-E-A-*, 27 I. & N. Dec. 40, 45 (B.I.A. 2017)); *Thayalan*, 997 F.3d at 143 (stating that the protected ground "must play more than a minor

---

[13] Of course, the petitioner's capacity as the mother of her son may have been a but-for cause for her decision to rebuff the gang's effort to recruit her son. But the "one central reason" standard requires much more than simple but-for causation; the protected ground must be *essential*, of *primary importance*, to the persecutors. *See Thayalan*, 997 F.3d at 143 (explaining that an asylum applicant does not satisfy the "one central reason" standard by merely showing that the protected ground is "a but-for cause of the persecution" (cleaned up)); *Rodriguez Tornes v. Garland*, 993 F.3d 743, 751 (9th Cir. 2012) (same). And as already explained, the petitioner's familial connection to her son was only incidental to the gang's reasons for threatening her.

role that is . . . [only] a means to a non-protected end" (citation omitted)); *Berrios-Bruno v. Garland*, No. 18-60276, 2021 WL 3624766, at *5 (5th Cir. Aug. 21, 2021) (per curiam) ("[A]n applicant's membership in a particular social group is not a motive for persecution if the persecutors are simply pursuing separate, unprotected objectives and the applicant's membership in the group is relevant only as a means to an end, that it just allows the persecutors to achieve their objectives."). Thus, *Hernandez-Avalos* failed to apply the heightened burden that Congress enacted.

Moreover, when *Hernandez-Avalos* was decided, there was no Fourth Circuit precedent to support it. The *only* authority that the panel cited in support of its expansive nexus holding was our decision in *Cordova v. Holder*, 759 F.3d 332 (4th Cir. 2014), which the *Hernandez-Avalos* panel said rejected a "similar" argument by the government. 784 F.3d at 950. That observation was incorrect. In *Cordova*, we vacated the BIA's no-nexus determination because it rested on an improper legal basis and ignored critical evidence. Specifically, the BIA found that the petitioner, who had been repeatedly threatened and attacked by El Salvadoran gang members, failed to show persecution on account of his family ties to his cousin and uncle—members of a rival gang who were ultimately murdered by the same gang targeting the petitioner. 759 F.3d at 334–37, 339. The BIA cited two reasons for its conclusion: First, the cousin and the uncle weren't themselves persecuted on account of family ties, so the petitioner likewise couldn't have been persecuted on that basis. *Id.* at 339. And second, the petitioner "was *first* targeted and harmed by [the] gang members purely as an incident of recruitment." *Id.* We rejected both of those bases, finding that (1) whether the petitioner's *cousin and uncle* were persecuted

53

on account of family ties did "not provide a basis for concluding that [the gang] did not target [*the petitioner*] on account of *his* kinship ties to his cousin and uncle"; and (2) the BIA "ignore[d]" evidence in the record that the gang's *later* attacks on the petitioner occurred not because of the gang's desire to recruit or extort the petitioner but "because it associated him with his cousin, a rival gang member." *Id.* Accordingly, nothing about *Cordova* counseled, much less required, the holding reaching in *Hernandez-Avalos*.

Thus, *Hernandez-Avalos* had it backwards: the BIA did not apply an excessively narrow interpretation; *we* applied—and continue to apply—an excessively *broad* interpretation, one that strips the term "central reason" of the independent meaning Congress intended to give it.

It is thus no surprise that *Hernandez-Avalos* has drawn sharp criticism from a number of our sister circuits in cases involving materially identical facts.

In *Orellana-Recinos v. Garland*, for example, the Tenth Circuit considered an asylum appeal in which the petitioner and her son were threatened by gang members who wanted to recruit the son. 993 F.3d at 853. The petitioner claimed that she was threatened on account of her family ties to her son, citing *Hernandez-Avalos* for support. *Id.* at 857–58. The Tenth Circuit rejected her claim, holding that the agency "could properly infer that the gang's 'ultimate motivation' was to recruit [the son], not to attack his family" such that the gang's threats against the mother were "a means to achieve an end that was unrelated to a protected ground." *Id.* at 858; *see also id.* (explaining that the gang members "would have the same attitude toward anyone—teacher, good friend, employer—who they thought could influence [the petitioner's son] to join the gang"). In reaching this conclusion, the

54

court explicitly rejected our reasoning in *Hernandez-Avalos*, a "factually similar" case: "To the extent that the Fourth Circuit's opinion holds that a gang's threats to persuade a mother to encourage, or at least allow, a son to join the gang is necessarily persecution on account of the mother's membership in the son's nuclear family, we are unpersuaded." *Id.*

Likewise, in *Sanchez-Castro v. U.S. Attorney General*, the Eleventh Circuit rejected an asylum claim from a petitioner who alleged that she was persecuted by a gang because of her family ties to her father. 998 F.3d at 1283–84. The petitioner's father lived and worked in the United States, leading the gang to conclude that the family was wealthy. *Id.* at 1284. The gang thus extorted the petitioner's mother, threatening to rape and kill the petitioner and other family members if the mother did not pay them money. *Id.* But the court found that substantial evidence supported the BIA's finding that the gang threatened the petitioner and her family only "as a means to an unrelated end," namely, the gang's desire "to raise funds." *Id.* at 1287 (citation omitted); *see also id.* ("When a family is targeted because its wealth makes it an obvious target for extortionate demands, that motivation does not constitute extortion because of family relationships." (cleaned up)). As in *Orellana-Recinos*, the court expressly "reject[ed] [the petitioner's] invitation to follow the approach of the Fourth Circuit [in *Hernandez-Avalos*]," finding that it "expands the nexus inquiry to include family status as a central reason even when it is 'incidental' and 'subordinate to another reason for harm.'" *Id.* (quoting *Parussimova*, 555 F.3d at 741).

Most recently, the Fifth Circuit has followed the Tenth and Eleventh Circuits in repudiating *Hernandez-Avalos*. In *Berrios-Bruno v. Garland*, an unpublished but nonetheless thorough and well-reasoned decision, a gang kidnapped the petitioner's

55

common-law husband for failing to make extortion payments and then threatened the petitioner and her children if she didn't make the demanded payments. 2021 WL 3624766, at *1. The Fifth Circuit rejected the petitioner's family-ties claim, holding that substantial evidence supported the BIA's conclusion "that the gang targeted [the petitioner] only to effectuate its interests in maintaining a viable extortion regime, not because it had some animus against [the husband's] family." *Id.* at *5; *see also id.* ("[T]he gang would have had the same attitude toward anyone who defied its extortion demands. [The petitioner's] relationship to [her husband] is thus relevant only as a means to the gang's illicit financial objectives."). In so holding, the Fifth Circuit joined the chorus of circuit courts criticizing and rejecting *Hernandez-Avalos*:

> It is true that [the petitioner's] family status likely explains why the gang persecuted her and not some other person. There is nothing that she did to draw the gang's ire; it was only the actions of her children's father that made her a target. The Fourth Circuit found nexus under similar circumstances [in *Hernandez-Avalos*]. . . .
>
> We disagree with this approach and find, moreover, that this approach is inconsistent with caselaw from the BIA, this court, and the majority view of other circuits.

*Id.* (citing cases).

In each of these three cases, the court properly applied the "one central reason" standard and rightly called out *Hernandez-Avalos*' untenable reasoning. The number of circuits to echo that refrain is sure to grow.[14]

---

[14] Although they have not explicitly denounced *Hernandez-Avalos*, other circuits have employed nexus reasoning that directly contradicts it. *See e.g.*, *Cruz-Guzman*, 920 F.3d at 1038 (affirming the agency's denial of a family-ties asylum claim where the (Continued)

56

We should therefore correct course and scrap *Hernandez-Avalos*' nexus framework with all haste. Otherwise, it will misguide our asylum jurisprudence further—causing more harm along the way—until more of our sister circuits condemn it or the Supreme Court overturns it for us.

V.

It is difficult to imagine that Congress, in enacting the asylum provisions of the INA, would have understood a case like this—where the applicant has provided no evidence that the persecutors singled her out for threats of harm as a means to suppress her religious exercise—to fall under the umbrella of religious persecution. Regrettably, the majority eschews that concern, constructing an amorphous standard for assessing nexus in religious-persecution cases contrary to Congress' intent. That is a significant error in my view.

Substantial evidence supports the BIA's no-nexus finding on Chicas-Machado's religious-persecution claim. I would therefore uphold that finding. And because Chicas-Machado also fails to show that the BIA erred in denying her separate particular-social-group claims, I would deny the petition for review in full.

---

applicant "failed to show that [the gang] was motivated by particular animus toward his family, as opposed to generally applicable financial desires"); *Cambara-Cambara v. Lynch*, 837 F.3d 822, 826 (8th Cir. 2016) (holding that the agency did not err in denying a family-ties withholding-of-removal claim because the applicants "provided no proof that the criminal gangs targeted members of the family *because* of family relationships, as opposed to the fact that . . . they were obvious targets for extortionate demands").

57