**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-2069**

———————

REYNA ELISA ALFARO-ZELAYA; E.J.A.Z.,

        Petitioners,

v.

PAMELA JO BONDI, Attorney General,

        Respondent.

———————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————

Argued:  September 12, 2025                     Decided:  October 31, 2025

———————

Before DIAZ, Chief Judge, and WILKINSON, and WYNN, Circuit Judges.

———————

Petition for review granted; vacated and remanded by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Diaz joined. Judge Wynn wrote an opinion concurring in the judgment. Judge Wilkinson wrote a dissenting opinion.

———————

**ARGUED:**  Edith Leonor Sangueza, Anne Elizabeth Peterson, CENTER FOR GENDER & REFUGEE STUDIES, San Francisco, California, for Petitioners.  Matthew B. George, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:**  Brian Boynton, Principal Deputy Assistant Attorney General, Anthony P. Nicastro, Assistant Director, Yanal H. Yousef, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————

WYNN, Circuit Judge:

Reyna Alfaro-Zelaya petitions for review of the final order of the Board of Immigration Appeals ("BIA") affirming the denial of her claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Because the BIA failed to meaningfully engage with the country-conditions evidence that Alfaro-Zelaya put forth in support of her claims, we grant the petition for review, vacate the BIA's order, and remand for further proceedings.

## I.

## A.

In 1993, Alfaro-Zelaya was born in Olanchito, Honduras. She was reared by her grandparents, and her uncle also lived in their home. From ages seven to fifteen, her uncle beat her when she didn't make food for him "because [she] was a woman . . . that was [her] job to make food for him." J.A. 164–65.[1] When her "grandparents figured that out," they kicked the uncle out of the house. J.A. 165–66. After that, her childhood was "good." J.A. 166.

Alfaro-Zelaya met a man named Brian sometime thereafter. They dated for six months before Alfaro-Zelaya moved in with him. He would "beat [her] up" and "call [her] a fool." J.A. 169. Alfaro-Zelaya gave birth to their son in 2013. On one occasion, Brian beat her badly and threatened her with a weapon, so she escaped to a relative's house and did not return to live with Brian.

---

[1] "J.A." refers to the Joint Appendix filed by the parties in this matter.

When her son was one, Alfaro-Zelaya began dating a man she had known for years, Juan Jose. "At the beginning," he treated her with respect. J.A. 173. But then he became jealous and began to beat her. The beatings continued when Alfaro-Zelaya became pregnant with their daughter. At one point late in her pregnancy, he beat her so badly that she went into labor and delivered her daughter via C-section. She moved back in with her grandparents afterwards. Alfaro-Zelaya testified in her credible-fear interview that, as recently as February or March of 2016, Juan Jose threatened to take their daughter away.

In 2016, to look for work and escape Juan Jose, Alfaro-Zelaya moved two hours away to La Ceiba and moved in with her mother. Alfaro-Zelaya found a job at a chicken shop. After only a few days, a man named Roberto Matute entered the store and asked her boss what her name was. After he learned her name, he would "harass" Alfaro-Zelaya and call her "mu[ñ]eca de porcelana, which is porcelain doll." J.A. 179. That is what "the men called young ladies when they want something with them." J.A. 179. Alfaro-Zelaya rebuffed him, but he said that "no woman used to say no to him." J.A. 180. Matute began to wait outside of the chicken shop and follow Alfaro-Zelaya home after work. He would sometimes pass by, or wait outside, her house several times a day. On one occasion, he attempted to force her into his car while carrying a gun. Just days after moving to La Ceiba, Alfaro-Zelaya fled back to her grandparents' house in Olanchito to escape Matute. But Matute stalked her there. At some point, she filed a police report in Olanchito. She also called the police twice, but they never answered.

About three days after her return to her grandparents' house, Alfaro-Zelaya was at a park in Olanchito when she spotted a suspicious car circling the park. She recognized the

3

driver as Matute when he rolled his window down. She attempted to escape to the woods, but he caught her and threatened to kill her and cut her daughter to pieces. She "yell[ed] and yell[ed]," and people at a government office nearby heard her and approached. J.A. 189. When Matute saw them, he let her go. Alfaro-Zelaya escaped uninjured, but her daughter had been scratched by their flight into the woods, so she took her to the hospital. On her way home from the hospital, Matute found her again, and she called the police, who did not answer.

Soon after, Alfaro-Zelaya's aunt paid for a coyote called El Chucho to take Alfaro-Zelaya to the United States, and on May 12, 2016, Alfaro-Zelaya left Honduras with her daughter, leaving her son with her grandparents. The coyote raped Alfaro-Zelaya during her journey.

Around March 2017, Matute, driving a car, collided with Alfaro-Zelaya's grandparents' car, which contained Alfaro-Zelaya's son, grandmother, and cousin. Another time, Matute asked Alfaro-Zelaya's mother where she was.

### B.

After Alfaro-Zelaya entered the United States, an asylum officer found that she demonstrated a credible fear of persecution or torture in Honduras. In June 2016, the Department of Homeland Security charged Alfaro-Zelaya and her daughter with inadmissibility. In November 2017, Alfaro-Zelaya, with her daughter as a derivative, filed an application for asylum, withholding of removal, and CAT protection.

On July 3, 2019, Alfaro-Zelaya had a merits hearing. The government introduced the untranslated police report Alfaro-Zelaya filed about Matute in Olanchito. Alfaro-Zelaya

4

introduced an expert declaration and country-conditions evidence showing dangerous conditions for Honduran women. The immigration judge admitted the expert declaration but afforded it "little weight" because the expert was unavailable to testify, and he admitted the rest of the country-conditions evidence. J.A. 140, 143.

Alfaro-Zelaya's counsel proposed particular social groups ("PSGs") of "Honduran women" and "unmarried mothers in Honduras."[2] J.A. 153–54. Alfaro-Zelaya testified to her abuse at the hands of her uncle, Brian, Juan Jose, and Matute. On cross-examination, she agreed that "the only reason [Matute] was bothering [her] was because [she] didn't want to have, to sleep with him." J.A. 201–02. And she agreed that she was no longer afraid of her uncle, Juan Jose, or Brian, and only feared Matute. Alfaro-Zelaya testified that she believed that if she remained in Honduras, Matute would kill her and her children. [She also testified that if she returned to Honduras, she would return to live with her grandparents and expressed a fear of traveling due to gang activity.

The immigration judge denied Alfaro-Zelaya's application. He found that she was not credible, in part because she could not remember the dates of events. He found that there was no evidence to corroborate her account of Matute's stalking. He concluded that her PSGs were not cognizable. And he found that, even were the PSGs cognizable—and assuming Alfaro-Zelaya was credible—Alfaro-Zelaya had not established a nexus between

---

[2] An applicant for asylum "must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). In front of the immigration judge, her counsel also claimed Alfaro-Zelaya was asserting protection for a "feminist" political opinion. J.A. 155. But Alfaro-Zelaya limits her appeal only to her membership in PSGs.

her persecution and proposed social groups. Rather, he explained, the "only reason [Alfaro-Zelaya] was targeted was because [Matute] wanted to further his romantic endeavors with her and for no other reason." J.A. 111. Further, he found that Alfaro-Zelaya had no objective fear of persecution because she could have further relocated within Honduras. Finally, the judge rejected Alfaro-Zelaya's CAT claim, finding that Alfaro-Zelaya failed to give the police sufficient time to protect her after filing the police report in Olanchito. He concluded that "it is not more likely than not that the respondent would be tortured by, or with the acquiescence of, the Honduran government." J.A. 112.

C.

Alfaro-Zelaya appealed to the BIA, which affirmed the immigration judge in an unpublished opinion. It affirmed the denial of asylum based only on the judge's "alternative finding that even assuming credibility, the respondent did not establish the requisite nexus between any past harm or feared future harm, and her membership in her proposed particular social groups or any other protected ground." J.A. 4. The BIA concluded that the "record supports the Immigration Judge's finding that the man's motivation for stalking, threatening, and physically mistreating the respondent was 'because he was infatuated with her and wanted to have a romantic relationship with her.'" J.A. 4. It explained that "the only reason she was harassed by this man was because she rejected his advances," which made her a victim of a private act of violence rather than persecution. J.A. 5. Finally, the BIA affirmed the denial of CAT relief, finding no clear error in the judge's determination that Alfaro-Zelaya didn't establish "that any future mistreatment would be with the consent or acquiescence of a government official." J.A. 6.

6

Alfaro-Zelaya timely petitioned for review in this Court.

## II.

Because the BIA adopted and supplemented the reasoning of the immigration judge, we review both opinions. *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). We can affirm the BIA only on "the grounds upon which the agency acted." *Nken v. Holder*, 585 F.3d 818, 822 (4th Cir. 2009) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)). We review the agency's factual findings for substantial evidence, affirming "unless a reasonable adjudicator would be compelled to reach a contrary conclusion," and we review legal conclusions de novo. *Cruz v. Sessions*, 853 F.3d 122, 128 (4th Cir. 2017).

Despite that deference, we need not affirm a decision of the BIA when it abuses its discretion. *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 247 (4th Cir. 2017). An abuse of discretion can occur when the BIA does not "offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." *Tassi*, 660 F.3d at 719.

## III.

On appeal, Alfaro-Zelaya challenges the BIA's finding that she did not establish a nexus between her particular social group and the persecution she suffered, as it pertains to her asylum and withholding-of-removal claims. She also argues that the BIA erred by

failing to consider relevant country-conditions evidence in evaluating her asylum, withholding-of-removal, and CAT claims.

Leaving the merits of the BIA's nexus determination for another day, we conclude that the BIA's failure to consider country-conditions evidence constitutes an abuse of discretion. Accordingly, we vacate and remand for further considerations.

A.

The outcome-determinative question in this case is whether the BIA abused its discretion in failing to fully consider the country-conditions evidence that Alfaro-Zelaya put forth to support her claims for asylum, withholding of removal, and CAT protection.

First, the CAT claim.

To demonstrate that she is entitled to CAT protection, a noncitizen must show "first, that it is more likely than not that [s]he will be tortured if removed to the proposed country of removal and, second, that this torture will occur at the hands of government or with the consent or acquiescence of government." *Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012) (citing 8 C.F.R. § 1208.16(c)(2)). Neither the immigration judge nor the BIA provided a reasoned explanation for finding that Alfaro-Zelaya failed to demonstrate a likelihood of torture. Instead, the BIA's denial of CAT relief was based on the finding that Alfaro-Zelaya failed to show that "any future mistreatment would be with the consent or acquiescence of a government official." J.A. 6.

In denying the CAT claim, the immigration judge stated,

> It is clear that the police in Honduras were at least willing to take her report. Based on her own testimony, it is she that elected to leave the country before allowing the police to

8

> continue with their investigation or to see if they would follow up and somehow prevent the man, Robert [Matute], from criminally harassing her.

J.A. 112. The BIA then affirmed, "based on the evidence of record," the "determination that the respondent has not established that any future mistreatment would be with the consent or acquiescence of a government official." J.A. 6.

But that truncated analysis disregarded at least two important pieces of evidence. First, it disregarded Alfaro-Zelaya's testimony that, prior to the attack at the park, she twice called the police to report Matute stalking her at her home in Olanchito. The police apparently took no action and certainly did not prevent Matute from nearly abducting Alfaro-Zelaya and her daughter at a park in Olanchito.

Second, it disregarded Alfaro-Zelaya's country-conditions evidence, which showed that "[v]iolence against women is rampant" in Honduras, fueled in part by "gaps in the criminal justice system." J.A. 401. That evidence showed that Honduras "has the highest femicide rate in the world," J.A. 410, and yet that crimes of sexual violence are particularly unlikely to be taken seriously by the police, with an "overall impunity rate [of] 95%." J.A. 332. Tellingly, in 2011, "gender-based violence was the second highest cause of death for women of reproductive age in Honduras." J.A. 334.

To be sure, neither the BIA nor the immigration judge needed to dispute each report line by line. *See Casalena v. INS*, 984 F.2d 105, 107 (4th Cir. 1993) (noting that the BIA need not "write an exegesis on every contention"). But we "routinely have determined that the BIA abuses its discretion when it arbitrarily ignores legally relevant information, even when the BIA states that it reviewed the record." *Funez-Ortiz v. McHenry*, 127 F.4th 498,

9

506 (4th Cir. 2025). We require more than "boilerplate language" and "perfunctory consideration." *Ai Hua Chen v. Holder*, 742 F.3d 171, 181 (4th Cir. 2014). Both the immigration judge and the BIA "did not engage with [Alfaro-Zelaya's] evidence at all," and the "wholesale failure to fully consider [Alfaro-Zelaya's] country-conditions evidence" is an abuse of discretion that demands, at least, vacatur. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 975 (4th Cir. 2019).

Because the BIA did not meaningfully engage with Alfaro-Zelaya's evidence that conditions in Honduras indicate that the government would have acquiesced in her torture, we vacate the BIA's denial of CAT protection and remand with instructions to consider that evidence anew.[3]

B.

Next, asylum and withholding of removal.

A noncitizen who seeks asylum must establish that they are a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i). That statutory requirement has three elements: the noncitizen must show "(1) that [they have] suffered past persecution or [have] a well-founded fear of future persecution; (2) that the persecution is 'on account of' [their] race, religion, nationality, membership in a particular social group, or political opinion; and (3) that the persecution is perpetrated by an organization that [their] home country's government is unable or

---

[3] Separately, Alfaro-Zelaya argued that the immigration judge violated her due process rights by admitting an untimely, untranslated version of the police report she filed in Olanchito. Because we vacate and remand, we need not address that argument. Even assuming she was prejudiced, Alfaro-Zelaya now has the proper notice to address the report on remand.

10

unwilling to control." *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (en banc) (quoting 8 U.S.C. § 1101(a)(42)(A)). The standard for withholding of removal is nearly identical, except an applicant "must show a clear probability of persecution on account of a protected ground." *Djadjou v. Holder*, 662 F.3d 265, 272 (4th Cir. 2011) (cleaned up). Applicants who cannot demonstrate asylum eligibility necessarily fail to qualify for withholding of removal. *Id.*

Because the BIA denied Alfaro-Zelaya relief only on nexus grounds, that's the only element of the standard we need to address on appeal. We offer no opinion on how Alfaro-Zelaya fares with respect to the other elements of the refugee definition, including whether her proposed PSGs were cognizable. To show that she was persecuted "on account of" membership in a PSG (also known as showing a "nexus"), Alfaro-Zelaya must demonstrate that her membership in a PSG is "at least one central reason why she, and not another person was targeted for [persecution] in the first place." *Romero v. Bondi*, 150 F.4th 332, 345 (4th Cir. 2025) (cleaned up). That reason can be "intertwined with others." *Alvarez Lagos v. Barr*, 927 F.3d 236, 250 (4th Cir. 2019) (cleaned up). Two PSGs are properly before us: "Honduran women" and "unmarried mothers in Honduras." J.A. 153.[4]

---

[4] On appeal to the BIA, Alfaro-Zelaya raised another PSG: "unmarried Honduran mothers who lack a strong male figurehead." J.A. 27. The BIA noted that Alfaro-Zelaya failed to exhaust this PSG because she failed to raise it at her hearing. J.A. 4 n.3 (citing *Quintero v. Garland*, 998 F.3d 612, 635–36 (4th Cir. 2021)). Alfaro-Zelaya has abandoned this PSG on appeal. Additionally, at her hearing, Alfaro-Zelaya argued she was persecuted due to her "feminist political belief." J.A. 155. But she failed to raise that argument in her brief to the BIA, and she abandons it on appeal to this Court.

11

The BIA denied Alfaro-Zelaya asylum and withholding of removal because it concluded that, assuming she was credible, the immigration judge did not clearly err in finding that Matute persecuted Alfaro-Zelaya "because he was infatuated with her and wanted to have a relationship with her," and not because of her membership in a PSG. J.A. 4.

Alfaro-Zelaya argues that the immigration judge and the BIA ignored two categories of evidence on these claims: the evidence of persecution by men other than Matute, and country-conditions evidence about Honduras.

To the extent Alfaro-Zelaya argues now that the BIA failed to consider evidence of her persecution at the hands of other men (i.e., her uncle and former partners Brian and Juan Jose), she failed to exhaust administrative remedies by failing to raise this argument to the BIA. *See* 8 U.S.C. § 1252(d)(1); *Tepas v. Garland*, 73 F.4th 208, 213 (4th Cir. 2023) (noting failure to exhaust can be a "basis for denying review of [her] claim"). The immigration judge did consider this evidence but dismissed it after finding Alfaro-Zelaya "made it clear today her only fear of returning to Honduras is based on her fear of Roberto [Matute]" and that "she is no longer afraid of the uncle or the two men she was in abusive relationships with." J.A. 107. In her brief to the BIA, although she mentioned the other men in her recitation of the facts and as support for her credibility, she did not point to them as a reason why the immigration judge's nexus determination was erroneous. Indeed, Alfaro-Zelaya comes close to admitting as much in briefing, stating that this challenge "was not fully developed below." Opening Br. at 48.

12

But, as with the CAT claim, both the immigration judge and the BIA ignored relevant country-conditions evidence that could have contextualized the abuse Alfaro-Zelaya suffered as a Honduran woman at the hands of Matute.[5] For example, Alfaro-Zelaya introduced a 2018 report from the Office of the United Nations High Commissioner for Human Rights finding that "patriarchal patterns of behaviour, attitudes, expectations, beliefs and practices discriminating against and denigrating girls and women remain widespread" in Honduras, J.A. 399, a report finding that women in Honduras are at increased risk for femicide and sexual violence, a paper finding that women's "lives are not valued and . . . their complaints are not taken seriously, a message that serves to normalize abuse and gender inequalities but also to silence women," J.A. 388, and a report from the Atlantic Council finding that Honduras has the highest rate of femicide in the world.

Such evidence may well have helped establish that Matute targeted Alfaro-Zelaya and not someone else because she was a Honduran woman. And "[i]t is this Court's responsibility to ensure that unrebutted, legally significant evidence is not arbitrarily

---

[5] In a supplemental authority response filed two days before oral argument, the government argued for the first time that Alfaro-Zelaya also failed to exhaust administrative remedies for this argument under 8 U.S.C. § 1252(d)(1). But Alfaro-Zelaya argued below that "country conditions evidence [shows] that the Honduran government is not merely unable to stop abuse of women but is willfully blind to it," J.A. 32, and that her asylum claim "must be evaluated in the context of the evidence regarding the particular circumstances in the country in question," J.A. 26. Regardless, the government did not make this failure-to-exhaust argument in briefing to which Alfaro-Zelaya could respond. Just as Alfaro-Zelaya waived arguments on appeal by failing to properly raise them, we must likewise hold that "[e]ven appellees waive arguments by failing to brief them." *Mironescu v. Costner*, 480 F.3d 664, 677 n.15 (4th Cir. 2007) (quoting *United States v. Ford*, 184 F.3d 566, 578 n.3 (6th Cir. 1999)).

ignored by the factfinder." *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 248 (4th Cir. 2017) (cleaned up). The BIA was required to "offer a specific, cogent reason" for rejecting the country-conditions evidence, but none was given. *Ai Hua Chen*, 742 F.3d at 179. So, the agency's "wholesale failure to discuss the evidence" is itself an abuse of discretion. *Zavaleta-Policiano*, 873 F.3d at 249.

Still, in vacating and remanding, it is important to be clear about what we are not doing.

First, Alfaro-Zelaya urges us to reverse the BIA's nexus determination in full—finding that her persecution was at least in part because of her membership in her particular social group and therefore reversing the denial of asylum and withholding of removal. But we think it prudent at this stage to allow the BIA to reconsider the evidence holistically before weighing in on that question. *See Nken*, 585 F.3d at 822 ("[W]hen a BIA order does not demonstrate that the agency has considered an issue, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" (quoting *INS v. Ventura*, 537 U.S. 12, 16 (2002)). We therefore hold only that the BIA abused its discretion in failing to consider highly relevant country-conditions evidence, as it must under our precedent. We leave the BIA to determine whether this evidence, properly considered, is enough to disturb its finding on nexus.[6]

---

[6] Because the BIA based its withholding-of-removal decision on its dismissal of the asylum claim, we vacate both decisions. *See Cordova v. Holder*, 759 F.3d 332, 340 n.7 (4th Cir. 2014) ("Since the BIA dismissed [the applicant's] withholding of removal claim solely because it found that he failed to meet the lower burden of proof for asylum, we must also vacate the BIA's order dismissing his withholding of removal claim.").

14

Second, we do not hold—as the dissent's parade of sister-circuit straw men might suggest—that a noncitizen may rely *solely* on country-conditions evidence to support a claim of persecution or torture. That is of course not the law, but it is also decidedly not what happened here.

In addition to the country-conditions reports, Alfaro-Zelaya presented evidence that she was subjected to violent threats from a man who relentlessly pursued her after she had made her rejection of his advances unmistakably clear. To dismiss this as a "fractured personal relationship" with a lustful man, as the dissent would have it, trivializes conduct that is, in truth, abusive and menacing.

At the end of the day, our colleague in dissent may disagree on matters of degree, but the principle remains immutable: *no means no*. And unless every encounter between a man and a woman in Honduras culminates with the man forcing her into a car at gunpoint, stalking her at her workplace, and threatening to dismember her child should she refuse to have sex with him, the dreaded breach in the floodgates the dissent foresees will remain securely shut.

IV.

Pursuant to the foregoing, we grant Alfaro-Zelaya's petition for review, vacate the BIA order, and remand for such other and further proceedings as may be appropriate.

*PETITION FOR REVIEW GRANTED; VACATED AND REMANDED*

15

WYNN, Circuit Judge, concurring:

I join the majority opinion in full because I agree that neither the BIA nor the immigration judge below fully considered highly relevant information that bears on the asylum, withholding of removal, and CAT claims.[*]

However, I would go further and reverse the BIA's asylum claim on the record before us because I believe the BIA committed both factual and legal error in failing to find a nexus between Alfaro-Zelaya's proposed particular social group and her persecution.

In my view, the only reasonable reading of the record is that Matute targeted Alfaro-Zelaya at least in part because of her gender. Although we have yet to address this exact question in an immigration case, it seems clear that Matute, a man sexually interested in women, would not have targeted Alfaro-Zelaya if she were not a Honduran woman. The BIA's contrary determination was therefore without substantial evidence, as no reasonable adjudicator could determine otherwise.

Alfaro-Zelaya draws an apt analogy to the Title VII context, where factfinders "have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to

---

[*] The dissent takes issue with the weight both the majority opinion and this concurrence give to country-conditions evidence. But the majority opinion is intentionally narrow, holding only that the BIA must now consider anew each of Alfaro-Zelaya's claims in light of the country-conditions evidence she offered below. And I write separately only to make two additional points: (1) the evidence before the BIA strongly indicated that gender was a central reason for Alfaro-Zelaya's persecution, and (2) in response to the dissent, this was no mere romantic entanglement gone awry.

16

someone of the same sex." Opening Br. at 39–40 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Thus, we have held that, "[w]hen someone sexually harasses an individual of the opposite gender, a presumption arises that the harassment is 'because of' the victim's gender." *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 752 (4th Cir. 1996) (abrogated on other grounds by *Bostock v. Clayton County*, 590 U.S. 644 (2020)). I would adopt that presumption in the asylum context: absent evidence to the contrary, a man who sexually harasses a woman is motivated in part by her gender.

Furthermore, even without breaking new ground, the conclusion that the agency misread the record is strongly supported by *Alvarez Lagos v. Barr*, where we reversed the agency's determination on nexus. 927 F.3d 236, 250 (4th Cir. 2019). There, Alvarez Lagos, a Honduran woman, was called a "whore" by a gang member who threatened to rape her and her daughter if she didn't pay the equivalent of $100. *Id.* at 244. The immigration judge found that she had failed to show a nexus between her persecution and the PSG of "unmarried mothers in Honduras living under the control of gangs," as the judge found that "the only significant reason for Alvarez Lagos's persecution was general civil strife and private criminal activity in Honduras." *Id.* at 246. Wrong, we held. Her country-conditions evidence showed that gangs targeted "vulnerable groups like single mothers." *Id.* at 250. And her testimony "supported the conclusion that her status as an unmarried mother was at least one central reason why she, as opposed to another person, was targeted for extortion and threats." *Id.*

Similarly, here, Alfaro-Zelaya's testimony clearly supports the inference that her status as a Honduran woman was a central reason why she was targeted. Matute called her

17

a "porcelain doll," implying that he wanted to sleep with her—and implying that he was sexually interested in women. J.A. 179. When she turned him down, he told her that "no woman used to say no to him," implying that he thinks women do not have agency to reject his advances. J.A. 180. These "gender-based slurs" and "gender-based threats" support—and in my view necessitate—the conclusion that Matute targeted Alfaro-Zelaya at least in part due to her gender. *Alvarez Lagos*, 927 F.3d at 245, 250–51. This inference is even stronger here than in *Alvarez Lagos* because there the sexual threats were used to bolster financial extortion, whereas here the sexual threats were made for their own sake.

The government protests that Alfaro-Zelaya's nationality, at least, had nothing to do with her persecution. But, as discussed in greater detail in the majority opinion, her country-conditions evidence—which the agency wholly failed to consider—demonstrated that social norms in Honduras render Honduran women at increased risk of sexual violence by men relative to women in other countries. Similarly, in *Alvarez Lagos*, we noted that Alvarez-Lagos's country-conditions evidence supported a finding of nexus to "unmarried mothers in Honduras living under the control of gangs," because the evidence showed that unmarried women were at particular risk in Honduras. 927 F.3d at 250. And other courts have also found a nexus between a noncitizen's persecution and her status as a woman from a particular country. *See, e.g.*, *Hassan v. Gonzales*, 484 F.3d 513, 518 (8th Cir. 2007) (holding that a noncitizen who suffered female genital mutilation showed a nexus to the group "Somali females").

I would also hold that the BIA committed legal error by failing to perform a mixed-motive analysis. We have "repeatedly admonished" the BIA for failing to conduct a mixed-

18

motive analysis and instead "applying a legally incorrect and 'excessively narrow' approach" to nexus. *Perez Vasquez v. Garland*, 4 F.4th 213, 221–22 (4th Cir. 2021) (quoting *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015)). "[T]ime and again we have held that facts such as these establish nexus between a well-founded fear of persecution and a protected ground[.]" *Chicas-Machado v. Garland*, 73 F.4th 261, 269 (4th Cir. 2023) (citing cases).

This case is yet another example of the same error. The BIA concluded that Matute's motive for persecuting Alfaro-Zelaya was that "he was infatuated with her and wanted to have a romantic relationship with her." J.A. 4. But Matute's aggressive pursuit of a romantic relationship with Alfaro-Zelaya is not at odds with the conclusion that he persecuted her because of her status as a Honduran woman. Indeed, they are perfectly consistent: Matute wanted to have a romantic relationship with her, in part, because she was a woman. The BIA also noted that Alfaro-Zelaya "stated that she was stalked and threatened by [Matute] because she refused to be in a romantic relationship with him." J.A. 5. However, the question is not the ultimate trigger for Matute's violence, but "why [Alfaro-Zelaya], and not another person was targeted . . . in the first place." *Romero*, 150 F.4th at 345. It would thus "'demand logical acrobatics' to reconcile the BIA's narrow and contradictory nexus analysis." *Chicas-Machado*, 73 F.4th at 269 (quoting *Temu v. Holder*, 740 F.3d 887, 891–92 (4th Cir. 2014)).

For better or for worse, the majority opinion does not yet reach the nexus question. In my view, our remand gives the BIA another chance to properly apply our precedent.

19

WILKINSON, Circuit Judge, dissenting:

I would deny the petition for review. Reyna Alfaro-Zelaya pitches her claims on reports about the mistreatment of women across wider Honduras. This country-conditions evidence, while lamentable, lacks specificity and cannot carry the day. By holding otherwise, the majority gives short shrift to the petitioner's burden to make an individualized showing and our duty to review factfinding for substantial evidence. Worse still, the concurring opinion comes ever closer to holding that heated altercations between men and women (of which there must be millions) lay the basis for an asylum claim. This is all too much, and I cannot assent.

I.

Consider first that all the claims before us demand facts tailored to the petitioner at issue. Asylum requires "specific, concrete" evidence with "some basis in the reality of the circumstances" of the applicant. *Huaman-Cornelio v. BIA*, 979 F.2d 995, 999 (4th Cir. 1992) (quotations omitted). The same goes for statutory withholding of removal. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987). And protection under the Convention Against Torture ("CAT") likewise necessitates "some particularized risk of harm." *Ibarra Chevez v. Garland*, 31 F.4th 279, 290 (4th Cir. 2022).

To be sure, country conditions can still play a role in these claims—a supplemental one. That is, before we can consider such evidence, the petitioner must first introduce facts unique to him showing persecution or torture. Then we must assess whether the country-conditions evidence captures the petitioner's circumstances at a fine level of granularity. If

20

it does, we may properly consider the reports in our review for substantial evidence. But if it does not, we must deem the reports too generalized to advance any particularized burden.

A.

With this framework in mind, Alfaro-Zelaya's petition rests on evidence as wide as all outdoors: reports that Honduran women and unmarried Honduran mothers, *in general*, suffer abuse without recourse. This lamentable state may or may not be accurate, but it does nothing to show how Alfaro-Zelaya *herself* suffers from persecution or torture.

I recognize this court has written that country conditions "could be decisive in establishing the necessary likelihood of future persecution or torture." *Chen v. Garland*, 72 F.4th 563, 572 (4th Cir. 2023); *see also Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 975 (4th Cir. 2019) ("[A] CAT applicant may satisfy his burden with evidence of country conditions alone." (alteration in original) (quoting *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 (9th Cir. 2010)). To the extent that "decisive" means country conditions may augment individualized facts to justify relief for an otherwise insufficient claim, I might agree. But to the extent that "decisive" means country conditions may justify relief even when a petitioner introduces scant particularized evidence, I dissent.

For one thing, such a capacious standard ignores the plain meaning of governing statutes and regulations. Asylum, for instance, requires the petitioner prove that he or she "is unable or unwilling to avail *himself or herself* of" the home country's protection due to some personalized characteristic. 8 U.S.C. § 1101(a)(42)(A) (emphasis added); *see id.* § 1158(b)(1)(B)(i). Statutory withholding of removal goes even further, demanding the petitioner show a "clear probability," *INS v. Stevic*, 467 U.S. 407, 430 (1984), "that *his or*

21

*her* life or freedom would be threatened in the proposed country of removal" for said characteristic, 8 C.F.R. § 1208.16(b) (emphasis added); 8 U.S.C. § 1231(b)(3)(A). And a petitioner seeking CAT protection must "establish that it is more likely than not that *he or she* would be tortured if removed." *Id.* § 1208.16(c)(2) (emphasis added).

Even when setting this contradictory text aside, the majority's seeming embrace of unadorned country conditions makes little sense. Asylum is meant to be "extraordinary." *Ngarurih v. Ashcroft*, 371 F.3d 182, 195 (4th Cir. 2004). The conditions for statutory withholding of removal are "even more stringent." *Rusu v. INS*, 296 F.3d 316, 324 n.13 (4th Cir. 2002). And CAT protection requires the "high bar" of proving torture. *Del Carmen Amaya-De Sicaran v. Barr*, 979 F.3d 210, 218 (4th Cir. 2020). Yet the majority's view of country-conditions evidence undermines all these burdensome-by-design standards; indeed, it effectively eliminates the need for Immigration Judges ("IJs") and the Board of Immigration Appeals ("BIA") to render individualized decisions altogether. For example, given Alfaro-Zelaya's victory today, does every Honduran woman—five-odd million of them in all—have the right to relief? Presumably not, yet the majority fails to explain how its holding will not facilitate such bedlam.

With so many reasons why we cannot rely so heavily on country conditions to show persecution or torture, it should come as no surprise that just about every sister circuit condemns the practice.

The First, on persecution: "[G]eneral reports that some members of a certain group are persecuted in a country do not establish that it is more likely than not that the applicant

22

himself will suffer persecution upon his return." *Melhem v. Gonzales*, 500 F.3d 78, 82 (1st Cir. 2007).

And on torture: "[G]eneral evidence about country conditions cannot compensate for the lack of specific evidence showing a particularized risk of torture." *Bazile v. Garland*, 76 F.4th 5, 16 (1st Cir. 2023).

The Second, on persecution: "[T]he evidence submitted regarding [country conditions] was not relevant to [the petitioner's] particular fear of persecution . . . . General violence in [her home country] does not constitute persecution, nor can it form a basis for petitioner's well-founded fear of persecution." *Melgar de Torres v. Reno*, 191 F.3d 307, 314 n.3 (2d Cir. 1999).

And on torture: "[W]hile . . . some of [the petitioner's] 'country conditions' documents indicate that some prisoners in [his home country] have been tortured, [he] has in no way established that someone in his particular alleged circumstances is more likely than not to be tortured . . . ." *Wang v. Ashcroft*, 320 F.3d 130, 144 (2d Cir. 2003) (emphasis and citation omitted).

The Fifth, on persecution: "[G]eneralized country conditions do not compel a finding that a petitioner has a well-founded fear of persecution . . . ." *Jameran v. Ashcroft*, No. 01-60980, 2002 WL 1022057, at *3 (5th Cir. May 14, 2002).

And on torture: "[G]eneralized conditions in a country tell courts little about the particularized risk of torture to an applicant . . . ." *Rubio v. Bondi*, 147 F.4th 568, 583 (5th Cir. 2025).

23

The Sixth, on persecution: "'The feared persecution must relate to the alien individually, not to the population generally.' Even if this court were to take judicial notice of [the petitioner's country-conditions reports, they] fail to demonstrate the 'individualized' fear of persecution required . . . ." *Harchenko v. INS*, 379 F.3d 405, 410 (6th Cir. 2004) (citation omitted) (quoting *Dokic v. INS*, No. 92-3592, 1993 WL 265166, at *4 (6th Cir. July 15, 1993)).

And on torture: "[W]e have never held that certain country-conditions reports, on their own, warrant relief. This is because each noncitizen must establish a particularized threat to him or her, and reports, on their own, don't get them over the line." *Yousif v. Garland*, 53 F.4th 928, 938 n.5 (6th Cir. 2022).

The Seventh, on persecution: "[T]he events that [the petitioner] relied on do not rise to the level of persecution . . . . That left [him] with the country-conditions evidence, which, untethered from facts establishing an individualized risk of persecution, did not further his case." *Zhou Ji Ni v. Holder*, 635 F.3d 1014, 1020 (7th Cir. 2011)

And on torture: "[T]he [petitioners'] failure to make a particularized showing that any of them would more likely than not be subject to torture upon their return, as differentiated from the general risk shared by [the members of certain ethnic group in a country], dooms their case." *Pelinkovic v. Ashcroft*, 366 F.3d 532, 542 (7th Cir. 2004).

The Eighth, on persecution: "[T]he harm suffered must be particularized to the individual rather than suffered by the entire population. Harm arising from general conditions such as anarchy, civil war, or mob violence will not ordinarily support a claim

24

of persecution." *Mohamed v. Ashcroft*, 396 F.3d 999, 1003 (8th Cir. 2005) (citation omitted).

And on torture: "Country reports alone are not sufficient for a finding of a particularized risk of torture . . . ." *Alvarez-Gomez v. Garland*, 56 F.4th 582, 591 (8th Cir. 2022).

The Tenth, on persecution: "[E]ven if a country's broader cultural and political context generally supports [a persecution finding], such evidence 'does not substitute for an analysis of the facts of each applicant's individual circumstances.'" *Juan v. Lynch*, 662 F. App'x 642, 643 (10th Cir. 2016) (quoting *Llana-Castellon v. INS*, 16 F.3d 1093, 1098 (10th Cir. 1994)).

And on torture: "[T]he conditions of a country alone are 'insufficient to demonstrate the applicant is more likely than not to be tortured upon returning there.'" *Arostegui-Maldonado v. Garland*, 75 F.4th 1132, 1147 (10th Cir. 2023) (quoting *Escobar-Hernandez v. Barr*, 940 F.3d 1358, 1362 (10th Cir. 2019)).

The Eleventh, on persecution: "The [country-conditions] [r]eports, on which the IJ ostensibly relied, make clear that guerillas exercise influence throughout [the home country] . . . . Nevertheless, [the petitioner's] inability to demonstrate she has a well-founded fear that she will be *singled out* for persecution on account of any protected ground is fatal . . . ." *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232 n.7 (11th Cir. 2005).

And on torture: "Although both petitioners produced evidence of generalized mistreatment and some isolated instances of torture, the evidence was insufficient to meet the petitioners' burdens of showing that they were individually 'more likely than not to be

25

tortured in the country of removal.'" *Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315, 1324 (11th Cir. 2007) (footnote omitted) (quoting 8 C.F.R. § 208.16(c)(4)).

Consider too the United Nations Committee Against Torture: "[A] consistent pattern of gross, flagrant or mass violations of human rights in a country does not . . . constitute a sufficient ground for determining [torture]; additional grounds must exist that indicate that the individual concerned would be personally at risk." *Mutombo v. Switzerland*, U.N. Doc. A/49/44, at 45 ¶ 9.3 (U.N. Comm. Against Torture 1994).

We would be right to join this esteemed company. Petitioners seeking asylum or statutory withholding of removal must offer specific evidence, individualized to their own circumstances, showing persecution. Petitioners seeking CAT relief must do likewise for torture. Holding otherwise leaves us on the badly losing side of a circuit split, dilutes the burdens set forth by statute and regulation, and thrusts open the gates of deportation relief to all those citing country-conditions reports much too general to meet petitioners' particularized statutory burden.

## B.

Stripped away of its supplemental country-conditions evidence, Alfaro-Zelaya's petition offers little. Much of her briefing focuses on her purported injuries suffered at the hands of her uncle and two boyfriends, yet she failed to challenge below the IJ's finding that these claims were not credible. The matter is therefore unexhausted and unreviewable. *See* 8 U.S.C. § 1252(d)(1); *Santos-Zacaria v. Garland*, 143 S. Ct. 1103, 1114–15 (2023). Alfaro-Zelaya also testified that she thought Matute would kill her and her children if she remained in Honduras. J.A. 193. Even assuming this subjective belief to be credible

26

(notwithstanding the IJ's finding it was not, J.A. 110), it fails to speak to the existence vel non of the objective truth. That leaves us with the alleged sexist remarks and acts of Matute. While the majority is right to disapprove them, it is wrong to think that they satisfy Alfaro-Zelaya's burden.

For one thing, they fail to "compel[]" the finding that Alfaro-Zelaya's status as a Honduran woman or single mother formed a "central reason for" Matute's misconduct. 8 U.S.C. § 1158(b)(1)(B)(i); *id.* § 1252(b)(4)(B). Rather, one can fairly read the record—as did the IJ and BIA, J.A. 4–5, 111—to indicate that Matute acted principally out of lust for Alfaro-Zelaya, whereas her gender, nationality, and single motherhood formed at most "incidental or tangential" drivers. *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 165 (4th Cir. 2009). Indeed, Alfaro-Zelaya herself admitted "the only reason" Matute "was bothering" her was because she rejected his advances. J.A. 201–02; *see also* J.A. 357–58 ("[Asylum] Officer: 'Why would [Matute] want to do this to you?' [Alfaro-Zelaya]: 'Because I didn't want to sleep with him.' Officer: 'Are there any other reasons he would want to do this to you?' [Alfaro-Zelaya]: 'Only because of that.'"). None of these authorities come close to suggesting that the ordinary and limitless examples of fractured personal relationships justify the extraordinary relief sought by petitioner in this case.

Further, Alfaro-Zelaya's focus on Matute overlooks a key party: the Honduran government. All her claims for relief require showing that her home nation has contributed to, acquiesced in, or failed to control her suffering. *Molina-Diaz v. Bondi*, 128 F.4th 568, 571–72 (4th Cir. 2025); 8 C.F.R. § 1208.18(a)(1). The IJ and BIA accordingly cited this

27

element for her CAT claim, observing how Alfaro-Zelaya failed to prove that Matute acted "with the consent or acquiescence of" Honduran officials. 8 C.F.R. § 1208.18(a)(1).

The record bears this conclusion out. Across the purportedly numerous days of Matute's harassment and attacks, Alfaro-Zelaya filed a single police report. J.A. 191, 207. Just one week later, she left Honduras. J.A. 207. Given such a short time frame, Honduran law enforcement can hardly be faulted for not taking any corrective action; allegations such as those against Matute demand, as a matter of simple fairness, a thorough investigation. Nor can we place weight in Matute presumably remaining at large. *See* J.A. 194–96, 432. Understandably, it would be hard to corroborate Alfaro-Zelaya's allegations once the key witness—herself—fled the country. And regardless, "the government's difficulty in eliminating" private instances of crime "does not equate to condoning it." *Del Carmen Amaya-De Sicaran*, 979 F.3d at 219.

True, Alfaro-Zelaya also alleges twice trying to call Honduran police and each time receiving no response. J.A. 191–92, 214–15. But this assumedly credible claim lands nowhere near our threshold for acquiescence. Just look at the facts underlying the case to which Alfaro-Zelaya analogizes: "[The petitioner] called the police 'many times' during a twelve-year period, calls to which the police often did not respond at all." *Orellana v. Barr*, 925 F.3d 145, 152 (4th Cir. 2019). Two missed calls over a week, after successfully filing a police report no less, are not even close to being "very similar." Opening Br. 56.

## II.

My brother Wynn would go so far as to reverse the BIA's asylum holding. This would be a remarkable disposition. Recall that after the IJ made an adverse credibility

28

determination, the BIA assumed—without deciding—that Alfaro-Zelaya's testimony was credible. J.A. 4. If, as the concurrence believes, substantial evidence does not support the BIA's factfinding *under this assumption*, the proper procedure would be to remand for a formal credibility determination. *See, e.g.*, *Wambura v. Barr*, 980 F.3d 365, 375 (4th Cir. 2020); *accord Krastev v. INS*, 292 F.3d 1268 (4th Cir. 2002) ("Where doubts have been raised as to the credibility of the applicant by either the Immigration Judge or the BIA, but the BIA makes no finding with regard to credibility, courts have held that the proper procedure is to remand to the BIA for a credibility determination."). By lobbying otherwise, the concurrence must think either that we can make a credibility determination without the BIA first doing so, or that the record supports reversal even sans Alfaro-Zelaya's testimony. Of course, the former constitutes impermissible factfinding, while the latter amounts to a reversal based solely on her country-conditions evidence, a proposition that the majority itself admits is not the law. Maj. Op. at 16.

Judge Wynn proceeds to trot out a parade of horribles of his own. But his undeniable assertion that male/female relationships sometimes have bitter edges leaves the relevance of the assertion to immigration law wholly unclear. The matters of which the majority speaks are most often questions for domestic law enforcement or for civil rights statutes akin to Title VII in this country. In seeking to transfer broad swaths of domestic matters to the immigration context, the concurrence disregards the vastly more limited scope evidenced by the language of the immigration acts themselves. *See supra* at 2 (noting the limiting terms of the immigration laws). *Compare, e.g.*, 42 U.S.C. § 2000e–2(a)(1) ("because of"), *with* 8 U.S.C. § 1158(b)(1)(B)(i) ("central reason"). Indeed, sister circuits

29

have already observed that the plain text of the "central reason" test demands more than mere but-for causation. *See, e.g.*, *Thayalan v. Att'y Gen.*, 997 F.3d 132, 142–43 (3d Cir. 2021); *Rodriguez Tornes v. Garland*, 993 F.3d 743, 751 (9th Cir. 2021). In ignoring the difference, the concurrence blurs the distinction between domestic and international law and impinges through law the secure borders that other branches of our government have worked hard to create. It ignores in the end nothing less than the principle that a nation without secure borders is that much less a nation, a consequence that Congress, not to mention most Americans, has taken pains to prevent.

### III.

The detour into the concurring opinion now complete, I return to my concerns with the approach in the majority. These immigration cases often involve a struggle between mind and heart, but it is the rule of law that must be honored in the end. Standards of review are not toss-offs. They derive their force from Congress, the Supreme Court, and our own precedent. Simply put, we are not free to just blow by them. And here, our standard of review is "highly deferential." *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020). Specifically, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

The IJ and BIA found, as a matter of fact, that Alfaro-Zelaya failed to show a nexus between her alleged harm and proposed social groups, and that she failed to show Honduras would consent to, or acquiesce in, any future suffering. J.A. 4–6, 111–12. Courts simply cannot use some generalized report floating high above the particularized threshold inquiry

30

to ignore every stop sign and red light we now drive through. I respectfully dissent and would deny the petition for review.